IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,580

STATE OF KANSAS,
*Appellee/Cross-appellant*,

v.

JACK R. LaPOINTE,
*Appellant/Cross-appellee.*

SYLLABUS BY THE COURT

1.

In considering whether to grant a new trial based on favorable postconviction DNA testing under K.S.A. 2017 Supp. 21-2512(f)(2)(B)(iv), the evidence must be of such materiality that a reasonable probability exists it would result in a different outcome at trial.

2.

The standard of appellate review of a trial court's order under K.S.A. 2017 Supp. 21-2512(f)(2) is whether the trial court abused its discretion. The decision whether to grant a new trial will not be disturbed on appeal if a reasonable person could agree with that decision.

3.

Under K.S.A. 2017 Supp. 22-3602(b)(3), an appeal may be taken by the prosecution as a matter of right after a final judgment in the district court upon a question reserved by the prosecution. Questions reserved in a criminal prosecution may proceed only when they seek a ruling on questions of statewide interest that are important to the correct and uniform administration of the criminal law and the interpretation of statutes.

1

**4.**

K.S.A. 2017 Supp. 21-2512(a) permits postconviction DNA testing under limited circumstances, which include when a person is in state custody. For purposes of this statute, the phrase "in state custody" applies to a person in federal custody subject to a detainer for a Kansas conviction when the motion to invoke the statute is filed.

**5.**

A court evaluates an equal protection challenge using a three-step process. First, the court considers whether the legislation creates a classification resulting in different treatment of similarly situated individuals. Second, if the statute does treat "arguably indistinguishable" individuals differently, then the court examines the classification or right at issue to determine the appropriate level of scrutiny. Finally, the court applies the proper level of scrutiny to the statute.

**6.**

The party challenging a statute's constitutionality under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution has the burden to prove an individual is similarly situated to members of a class receiving different treatment.

Review of the judgment of the Court of Appeals in an unpublished opinion filed November 23, 2016. Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed February 15, 2019. Judgment of the Court of Appeals affirming the district court is affirmed on the issue subject to our review. Judgment of the district court is affirmed. The cross-appeal is sustained in part and denied in part on the questions reserved.

*Richard Ney*, of Ney, Adams & Miller, of Wichita, argued the cause and was on the briefs for appellant/cross-appellee.

*Jacob M. Gontesky*, assistant district attorney, argued the cause, and *Steven J. Obermeier*, senior deputy district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

BILES, J.: A jury convicted Jack R. LaPointe of aggravated robbery and aggravated assault. From the evidence, the jury knew hairs found on clothing believed to be worn by the perpetrator probably did not belong to LaPointe. Years later, LaPointe requested DNA testing under K.S.A. 2017 Supp. 21-2512, which authorizes postconviction analysis of biological material for first-degree murder and rape cases. The district court granted the motion over the State's vigorous objections. The analysis confirmed one hair did not belong to LaPointe, while the other was inconclusive but probably not his. He now seeks a new trial, claiming these test results would have changed the original trial's outcome. Lower courts denied that relief. LaPointe appeals. The State cross-appeals over the preliminary battles lost opposing testing.

We unanimously affirm the decision denying LaPointe a new trial. The district court did not abuse its discretion when it determined there was no reasonable probability these results would have changed the original trial's outcome. See K.S.A. 2017 Supp. 21-2512(f)(2) (reciting test for granting new trial).

As to the State's cross-appeal, we unanimously hold LaPointe was in state custody for purposes of K.S.A. 2017 Supp. 21-2512(a) (permitting DNA testing for a person "in state custody" convicted of first-degree murder or rape), even though he was in a federal prison when he applied for testing. As to the State's objection that LaPointe's crimes were not statutorily eligible for DNA testing, a majority agrees. That portion of the State's cross-appeal is sustained. In so deciding, we overrule *State v. Cheeks*, 298 Kan. 1, 310

3

P.3d 346 (2013) (*Cheeks I*), which expanded postconviction DNA testing to a second-degree murder defendant to avoid perceived equal protection problems.

FACTUAL AND PROCEDURAL BACKGROUND

In October 2000, a man robbed a Roeland Park Payless store at gunpoint, taking about $1,000 stuffed into a shopping bag. A store clerk, customers, and others in a nearby parking lot provided general descriptions, but only one witness later identified LaPointe. Police found a plaid shirt and baseball hat at a breezeway in a nearby apartment complex. They discovered a pair of gloves in a different breezeway. A tracking dog led officers to a blue bandana under a car in the complex parking lot. Head hairs were found on the clothing. LaPointe was eventually charged.

At trial, Robert Booth, chief criminologist for the Kansas City, Missouri, crime lab, testified the hairs most likely did not belong to LaPointe, although he allowed there was a possible "remote explanation" that LaPointe could still be the source. This could happen, he said, if LaPointe changed the way he maintained his hair after the officers found the clothing and before a known sample was obtained from LaPointe for comparison. Booth characterized this possibility as rare. Booth testified that "just because [the hairs] may not be his or doesn't match does not mean he never wore the garb itself. He could have worn them and not shed any hair or we didn't find the hair he shed." On cross-examination, Booth would not agree the person who shed the hairs was "most likely the person most recently to have worn the items." But when asked if it would "be more likely than not," Booth responded "probably so." Booth ultimately concluded the hairs probably were not LaPointe's.

4

A State DNA expert testified the lab could not extract sufficient material from the bandana, shirt, cap and gloves to make a DNA comparison. There were three usable latent fingerprints from the crime scene, but none matched LaPointe's.

The State's strongest evidence came from Michael Norton, who said he committed the crime with LaPointe. Norton testified in exchange for immunity. He said the two planned to commit a robbery in a "low-key" area. The pair would split the proceeds, and LaPointe would pay Norton to satisfy a debt. Norton said the plan was to park in a residential area, hopefully an apartment complex where the vehicle would be inconspicuous. LaPointe chose the Payless. Norton parked the car in the adjacent apartment complex to wait while LaPointe robbed the store. Norton testified LaPointe wore blue jeans and a sweater and was holding a baseball cap and a handkerchief when he got out of the car. LaPointe used a sawed-off shotgun he got from Norton. About 10-15 minutes passed before Norton saw LaPointe standing outside a store next to the Payless. About five minutes later, LaPointe came running back with the money, the handkerchief, and the gloves.

Testifying in his own defense, LaPointe confirmed he had known Norton since 1998. He also confirmed he lost a pistol belonging to Norton, who demanded money for it. LaPointe testified he got a sawed-off shotgun and gave it to Norton. He denied seeing Norton the day of the robbery and denied committing the crimes. Additional evidence we will detail later conflicted with or corroborated these accounts.

The jury convicted LaPointe. The district court sentenced him to the middle grid-block sentence of 233 months for aggravated robbery and to the middle grid-block sentence of 12 months for the aggravated assault. The court ordered LaPointe's sentences to run consecutive to each other and to existing West Virginia, Kansas, and federal sentences. LaPointe's criminal history score was an A.

*The battles over DNA testing*

In 2014, LaPointe tried to invoke K.S.A. 2014 Supp. 21-2512 for postconviction DNA testing of the biological material found on the clothing thought to have been worn by the robber. An obvious question was whether his crimes qualified for this because the statute allows only persons convicted of first-degree murder or rape to request testing under specific circumstances.

LaPointe noted our court's caselaw had expanded the statute's scope based on the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. See *Cheeks I*, 298 Kan. at 11 (statute violates equal protection as applied to individuals convicted of second-degree murder and sentenced to 15 years to life imprisonment). LaPointe contended he was similarly situated to those persons listed in the statute because of his prison term. The State objected, arguing LaPointe's crimes differed from first-degree murder and rape, and the Legislature had authority to distinguish between crimes when deciding DNA testing eligibility. The district court agreed with LaPointe and ordered testing.

From that point, the litigation split into separate tracks. First, the State immediately appealed the order granting testing. But a Court of Appeals panel dismissed that effort for lack of jurisdiction. *State v. LaPointe*, 51 Kan. App. 2d 742, 750, 355 P.3d 694 (2015) (*LaPointe I*). Our court affirmed, holding the State's chosen procedural path was premature. *State v. LaPointe*, 305 Kan. 938, 947, 390 P.3d 7 (2017) (*LaPointe II*). On the second track, the testing was completed while the interlocutory appeal proceeded. The State produced two hairs. One, described as a "[h]air shaft from cap/gloves," yielded test results that were inconclusive but more likely than not excluded LaPointe as the contributor. The other, described as a "[h]air shaft from bandana," produced test results conclusively excluding LaPointe as the source.

6

Based on those results, LaPointe asked the district court to vacate his convictions or, alternatively, grant him a new trial. The State argued the results would not have affected the jury's verdict because they merely confirmed the hairs did not belong to LaPointe, which the jury already knew.

The district court agreed LaPointe was not entitled to a new trial. The court found the results were favorable but insufficient to support a reasonable probability they would result in a different trial outcome. The court reasoned the jury convicted LaPointe when it was clear no physical evidence linked him to the robbery and that most likely he did not contribute the hairs. The court noted defense counsel emphasized both these points at trial. It also concluded the DNA results would have had little to no impact on the testimony from Norton and the eyewitnesses.

LaPointe appealed, and the State cross-appealed on its two statutory eligibility arguments:  (1) LaPointe was not in state custody when he requested DNA testing; and (2) LaPointe's crimes were not those the Legislature specified. A Court of Appeals panel affirmed the decision denying LaPointe a new trial. It dismissed the State's cross-appeal without reaching the merits. *State v. LaPointe*, No. 113,580, 2016 WL 6910200, at *6 (Kan. App. 2016) (unpublished opinion) (*LaPointe III*).

Citing *Haddock v. State*, 295 Kan. 738, Syl. ¶ 4, 286 P.3d 837 (2012) (*Haddock II*), the panel acknowledged the test results were favorable to LaPointe but concluded the district court was within its discretion to deny a new trial. 2016 WL 6910200, at *3, 5. After summarizing the witness testimony, the panel reasoned:

"[A] careful review of the record reveals that LaPointe's jury heard evidence that one eyewitness identified LaPointe, Norton testified he conspired with LaPointe to commit

7

this robbery, and the experts did not believe that it was LaPointe's hair found in the recovered clothing. In addition, no fingerprints were recovered matching LaPointe's fingerprints. In light of the fact that there was no forensic evidence connecting LaPointe to the crime during the first trial, the district court did not err in holding that the DNA test results were not of such materiality that there was a reasonable probability a jury would have reached a different outcome had it considered the test results." 2016 WL 6910200, *5.

Both parties timely petitioned for review. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

THE FAVORABLE DNA TESTING DOES NOT WARRANT A NEW TRIAL

We consider first LaPointe's argument that the district court erred in denying him a new trial when the DNA outcomes showed a hair from the perpetrator's clothing did not belong to him and that a second hair was probably not his. We hold the court did not abuse its discretion.

*Standard of review*

K.S.A. 2017 Supp. 21-2512 specifies mandatory dispositions and procedural requirements depending on how DNA testing results are characterized: (1) unfavorable, (2) favorable, and (3) inconclusive. See *Haddock v. State*, 282 Kan. 475, 495, 146 P.3d 187 (2006) (*Haddock I*). The analysis turns on the category. K.S.A. 2017 Supp. 21-2512(f); see *Goldsmith v. State*, 292 Kan. 398, 402, 255 P.3d 14 (2011). "To be 'favorable,' the test result need not completely exonerate the petitioner." *Goldsmith*, 292

8

Kan. at 402. In LaPointe's case, it is undisputed the results are favorable, so the statute provides:

"(2) If the results of DNA testing conducted under this section are favorable to the petitioner and are of such materiality that a reasonable probability exists that the new evidence would result in a different outcome at a trial or sentencing, the court shall:

(A) Order a hearing, notwithstanding any provision of law that would bar such a hearing; and

(B) enter any order that serves the interests of justice, including, but not limited to, an order:

(i) Vacating and setting aside the judgment;

(ii) discharging the petitioner if the petitioner is in custody;

(iii) resentencing the petitioner; or

(iv) granting a new trial." K.S.A. 2017 Supp. 21-2512(f).

Applying its plain language, this provision means favorable testing alone does not mean the district court must grant a defendant affirmative relief. See *Haddock II*, 295 Kan. at 756.

"In almost all cases where the new DNA evidence is favorable, except in those cases where the court after hearing has entered any other order to serve the interests of justice, the hearing judge is faced with a decision of whether to grant a new trial based upon the favorable results from the new DNA testing.

9

"The standard for whether to grant a new trial under such circumstances is similar to our standard for granting a new trial based upon newly discovered evidence, except that no time limit exists for such a motion and a defendant need not establish that the new evidence was newly discovered. In all other respects it is treated as a motion for new trial governed by the provisions of K.S.A. 22-3501: 'The court on motion of a defendant may grant a new trial to him if required in the interest of justice.'

"Just as the court '*shall enter any order that serves the interests of justice*' under the provisions of K.S.A. 2005 Supp. 21-2512, one such order 'in the interest of justice' is an order for a new trial. In order to grant such an order, the 'evidence must be of such materiality that a reasonable probability exists that it would result in a different outcome at trial. [Citation omitted.]' *State v. Henry*, 263 Kan. 118, 132-33, 947 P.2d 1020 (1997). We additionally note that just as an order granting a new trial under K.S.A. 22-3501(1) is subject to an abuse of discretion, the standard of appellate review of a trial court's order under K.S.A. 2005 Supp. 21-2512 is whether the trial court abused its discretion. See *State v. Adam*s, 280 Kan. 494, 501, 124 P.3d 19 (2005)." *Haddock I*, 282 Kan. at 498-99.

The district court's decision whether to grant a new trial, as long as it has an adequate basis in fact and law, will not be disturbed on appeal if a reasonable person could agree with that decision. *Haddock II*, 295 Kan. at 763; see also *State v. Rodriguez*, 302 Kan. 85, 98, 350 P.3d 1083 (2015) ("We conclude the district court did not err in essentially holding there is no reasonable probability a jury would have reached a different outcome had it considered the testing results. [Citation omitted.] So the court did not abuse its discretion in denying [the] motion for new trial . . . ."); *State v. Brune*, 307 Kan. 370, 372, 409 P.3d 862 (2018) (abuse of discretion demonstrated if decision [1] arbitrary, fanciful, or unreasonable; [2] based on an error of law; [3] based on an error of fact).

10

With this understanding, it is necessary to dive deeper into the evidence because that was the foundation underlying the district court's denial of relief and the panel's affirmance.

*Additional background*

As mentioned, the most direct evidence came from Norton, who admitted being an accomplice and testified in exchange for immunity. He disclosed he had 14 prior convictions for crimes involving dishonesty or false statements, not including federal bank robbery and conspiracy convictions. He was in federal custody when he testified.

In addition to telling the jury about the pair's robbery plans, the jury knew Norton told an FBI agent a few weeks after the robbery that LaPointe said he threw the gun used in the crime on the roof of a Fashion Bug store near the Payless store. Norton also told officers LaPointe threw the gun on a roof but did not say which one. Officers recovered the gun from the Fashion Bug roof.

LaPointe's wife corroborated Norton's testimony about LaPointe losing his gun and obtaining a shotgun sometime in October 2000. But she also testified favorably for the defense, such as explaining that LaPointe's appearance when the crime occurred did not match the perpetrator's descriptions given by eyewitnesses and that she was on call at work the night of the robbery, and Norton was at her Kansas City home when she was called in about 7:30 p.m.

Eyewitness testimony was also mixed. A woman in the parking lot outside the Payless told police she saw a man walking quickly and carrying a gun. She said the man was white but did not remember his height, weight, age, or clothing, except that he had a bandana or do-rag on his head and his hair pulled back. When police showed her a photo

11

lineup that did not include LaPointe's photo, she said all were too young to be the robber. Police showed her another photo lineup nearly three months after the robbery that included LaPointe's photo based on information received from Norton. She identified LaPointe as the robber.

A woman who was with her in the parking lot was confident the man they saw was not carrying a weapon, although she admitted her recollection was dull and noted she suffered a stroke weeks before the robbery that adversely affected her short-term memory. She was unable to help police do a composite drawing. During her police interview, she told officers the man she saw was 5'10", had a skinny build, was not wearing anything on his head, was dressed in a blue flannel shirt, and held something looking like a white plastic trash bag.

The store clerk, who put the money in a shopping bag for the robber, described him as a white male, about 6 feet tall, and in his mid to late twenties. She said he wore a plaid jacket with a bandana covering his face. She said he had short, blond or yellow hair that looked dyed because the roots were darker than the top. She described his hair as not very long and "probably just spikey." The clerk at first picked a person other than LaPointe from a photo lineup, which did not include LaPointe's photo, about two weeks after the robbery but at trial said she would not recognize the perpetrator if she saw him again.

A Payless customer said the robber was white, young—about 26 or 27 years old— and slender, with blond hair and wearing a cap. The customer's then-11-year-old daughter described the perpetrator as white, about 6 feet tall, having short blond, spikey hair, skinny, looking tough or muscular, and not wearing a hat.

This evidence was thoroughly discussed by counsel during their closings. The prosecutor noted Norton did not meet the perpetrator's physical description because he is bald and not tall enough. The prosecutor also contended the parking lot witness was the only person with any degree of accuracy who saw LaPointe. The scientific evidence was dismissed as "very inconclusive" and "a wash." The prosecutor said:

> "The hair appears not to be Mr. LaPointe's. But frankly, we can't tell you that he didn't wear that bandana, that he did not wear that shirt, he didn't wear that cap because of the easy transference of hair. We don't know who wore that bandana the day before. Maybe it was Loretta LaPointe's daughters, maybe it was Loretta LaPointe. We don't know where that bandana was the day before this robbery occur[red]. The scientific evidence unfortunately is a wash.
>
> "So what you have left for your consideration is the testimony of Michael Norton and [the parking lot witness], the eyewitness."

The prosecutor maintained the parking lot witness' identification and the composite sketch completed with her help shortly after the crime corroborated Norton's testimony.

LaPointe's counsel argued the man another witness identified in a photo lineup might have committed the crimes. Counsel called the parking lot witness' testimony into question by pointing out inconsistencies with her companion's testimony and her brief opportunity to see the robber. Defense counsel also challenged Norton's credibility. And with respect to the forensic evidence, counsel said:

> "I applaud [the prosecutor] for the fact that she puts on all the evidence. If she hadn't put on crime lab people I would have. And that's why the preparation of the defense case was fairly brief because she put on a great deal of the witnesses that I would have called had

13

she not. She put on a great deal of witnesses that provided no beneficial information whatsoever to you.

"We've got hairs from somebody that wore that bandana. Those hairs, I believe if I recall the testimony correctly of the examiner from Missouri, indicated that the person—it was most likely that the person that most recently wore that bandana was the one responsible for leaving those hairs on the bandana."

Later he argued:

"All of you are probably wondering what you were doing here listening to all of the testimony from all these specialists talking about all of what they didn't have. They had no matching prints, they did not have enough DNA, they didn't have enough hair. I don't know that it's quite a wash, as [the prosecutor] would say.

"The hair guy testified with some degree of certainty it was certainly not Mr. LaPointe's hair. They see no [*sic*] remote possibility it might have been but it seemed clear he did not believe it to be the case."

*Discussion*

LaPointe maintains the panel's analysis failed to assess the new evidence's impact in light of the record as a whole. In particular, he contends the panel should have considered whether the test results undermined confidence in the eyewitness identification and accomplice testimony. In his view, the panel merely conducted an inquiry of the evidence's sufficiency. And he argues the district court abused its discretion by basing its decision on an error of law—failing to "make a probabilistic determination about the likely impact of the new evidence on reasonable, properly instructed jurors." See *Haddock II*, 295 Kan. 738, Syl. ¶ 6.

14

But the record belies this notion. The State's hair comparison expert testified LaPointe probably did not contribute the hairs and acknowledged the possibility was remote that he did contribute them. The expert also testified the fact LaPointe's hair did not match the recovered samples from clothing thought to belong to the robber did not mean LaPointe had not worn those items. And the prosecutor conceded there was no other forensic evidence connecting LaPointe to the crime, while defense counsel emphasized this as a gaping hole in the State's case.

The favorable test results affirmed the hair comparison expert's opinion that the hair was probably not LaPointe's. But they do not alter the expert's further testimony that the fact the hair did not belong to LaPointe did not mean he did not wear the clothing. The possibility raised by Booth remains that LaPointe might not have deposited hair on the clothing or that the State simply did not find any hairs he did shed. "[T]he presence of a reasonable explanation mitigates the potential impact of the evidence if there were a retrial, a consideration that can be made in making a probabilistic determination about what reasonable, properly instructed jurors would do." *Haddock II*, 295 Kan. at 772.

LaPointe's case is analogous to *Rodriguez*, in which the trial court was within its discretion to deny a new trial even though postconviction DNA testing established a third-party's DNA was on a pillowcase in a bedroom where a rape occurred. No physical evidence linked Rodriguez to the attack, and his conviction was based on the victim identifying him. The *Rodriguez* court pointed out the jury heard explanations about why the third-party's DNA could be in the bedroom and why the defendant's DNA might not. The jury also was "able to assess [the victim's] credibility and the evidence corroborating her testimony and to decide whether she was capable of identifying Rodriguez as her attacker." 302 Kan. at 97. The court reasoned the results showing the pillowcase sample was not likely connected with the rape did not advance the defense theory that someone else committed the crime. 302 Kan. at 98.

15

In *Haddock II*, when the evidence left open the possibility a hair in the victim's hand belonged to the victim or a third party, postconviction testing confirming the hair was not the defendant's also raised no reasonable probability of a different outcome. This was because defense counsel noted this possibility during closing, and the district court's evidentiary ruling preventing reference to the hair being defendant's reinforced that the DNA testing at the time of trial did not decisively establish the hair was the defendant's. *Haddock II*, 295 Kan. at 772-73.

Similarly, LaPointe's jury heard testimony explaining why hair not belonging to LaPointe could be on the clothing and why his DNA might not be found there. And the jury could assess witness credibility, including Norton's, who had substantial evidence damaging his trustworthiness. But key details to Norton's testimony were corroborated by the recovered gun from the Fashion Bug roof based on his tip; testimony from LaPointe's wife and LaPointe confirming details about the sawed-off shotgun and the debt-repayment arrangement; and the eyewitness identification.

We hold the panel correctly concluded a reasonable person could agree with the district court's decision to deny LaPointe a new trial.

THE STATE'S QUESTIONS RESERVED

As mentioned, the State vigorously opposed LaPointe's efforts to have postconviction DNA testing. The State based its opposition on two expressly stated criteria in K.S.A. 2017 Supp. 21-2512:  (1) a person requesting testing must be "in state custody"; and (2) that person must have been convicted of first-degree murder or rape. The State noted LaPointe was in federal prison when he requested testing and that his convictions were not statutorily specified.

16

When the district court rebuffed these arguments, the State immediately took its ill-fated appeal "upon a question reserved" under K.S.A. 2017 Supp. 22-3602(b)(3), which was dismissed for lack of jurisdiction because the testing order was not a final judgment. *LaPointe II*, 305 Kan. 938. But after the district court denied LaPointe relief, the State renewed its challenges to LaPointe's statutory eligibility for testing by cross-appealing and citing the question reserved statute as its jurisdictional basis.

There is no dispute the district court entered a final judgment, so the State's ability to proceed with its questions reserved depends on whether they are of "'statewide interest important to the correct and uniform administration of the criminal law and the interpretation of statutes.'" *LaPointe II*, 305 Kan. at 944 (quoting *State v. Leonard*, 248 Kan. 427, 432, 807 P.2d 81 [1991]). We agree this qualifying criteria for answering the State's questions reserved are met.

Questions reserved presuppose the case at hand has concluded but that an answer is necessary for proper disposition of future cases. *State v. Puckett*, 227 Kan. 911, 912, 610 P.2d 637 (1980). Our court has accepted such appeals in many circumstances. See, e.g., *State v. Stallings*, 284 Kan. 741, 742, 163 P.3d 1232 (2007) (whether defendant has right to allocution before the jury during the death penalty phase); *State v. Murry*, 271 Kan. 223, 21 P.3d 528 (2001) (whether trial court erred in suppressing blood sample evidence taken from defendant prior to arrest); *State v. Cockerham*, 266 Kan. 981, 984, 975 P.2d 1204 (1999) (whether granting credit for time served modifies sentence); *State v. Chastain*, 265 Kan. 16, 22-23, 960 P.2d 756 (1998) (whether trial court erred in refusing to admit horizontal gaze nystagmus testing evidence, and whether jury should consider victim's fault in determining if defendant is guilty of involuntary manslaughter or vehicular homicide); *State v. Roderick*, 259 Kan. 107, 109, 911 P.2d 159 (1996) (whether "the fact that a defendant enters guilty pleas for multiple offenses in separate

17

cases on the same date preclude[s] the use of those convictions in determining the defendant's guidelines criminal history score for sentencing on those offenses"); *City of Overland Park v. Cunningham*, 253 Kan. 765, 766, 861 P.2d 1316 (1993) ("whether an objection for 'lack of foundation' is sufficient when a request for a more specific objection is made"); *State v. Lash*, 237 Kan. 384, 385, 699 P.2d 49 (1985) (whether the trial court erred by excluding expert opinion testimony that father sexually molested son).

More recently, this court sharply divided on one question now presented on the equal protection analysis for postconviction DNA testing restrictions and the convictions statutorily eligible for its provisions, i.e., first-degree murder and rape. See *Cheeks I*, 298 Kan. 1 (4-3 majority holding statute violates equal protection as applied to individuals convicted of second-degree murder and sentenced to 15 years to life imprisonment). In *Cheeks I*, the majority noted the DNA testing statute's purpose is to provide "an opportunity for exoneration to innocent individuals convicted of severe crimes" and on that basis judicially expanded its scope. 298 Kan. at 6, 11.

We hold the State's questions reserved are of statewide interest important to the correct and uniform administration of the criminal law and the interpretation of statutes. We proceed to addressing them.

*Standard of review*

The State's questions reserved present issues of statutory interpretation subject to de novo review. See *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015).

*LaPointe was "in state custody" as K.S.A. 2017 Supp. 21-2512 requires.*

This court has addressed the "in state custody" requirement only once. In *State v. Cheeks*, 302 Kan. 259, 352 P.3d 551 (2015) (*Cheeks II*), the court noted the statute's plain language provides in the present tense that a person in state custody "'may petition'" for testing. This, the court held, meant Cheeks needed only to be in state custody when filing the petition. Cheeks met this timing requirement, so the court determined it unnecessary to address whether a defendant must remain "'in state custody'" while a court processes the request after release on parole. 302 Kan. at 260-61.

In LaPointe's case, he was in federal prison when he filed his motion, so *Cheeks II* does not apply. The State argues any detainer lodged for LaPointe after his release from federal custody imposed no obligation on the federal government if the State failed to take him into custody. We reject this reasoning.

The ordinary definition of "custody" refers to either physical control over the person or a legal restraint. See Black's Law Dictionary 467 (10th ed. 2014) (defining custody as "care and control of a thing or person" or detention of a person "by virtue of lawful process or authority"). In the context of K.S.A. 60-1507 relief, which permits "[a] prisoner in custody under sentence" to move the court that imposed the sentence to vacate it or set it aside, the Court of Appeals has held the existence of a Kansas detainer permitted a defendant to challenge his Kansas sentence, even though he was in a Missouri prison and had not yet begun to serve the Kansas sanction. *Maggard v. State*, 27 Kan. App. 2d 1060, 1063, 11 P.3d 89 (2000). And this court has held the restraints imposed by probation are sufficient to constitute custody for K.S.A. 60-1507 purposes. *Miller v. State*, 200 Kan. 700, 704, 438 P.2d 87 (1968) (holding conditions set out in probation order were "significant limitations upon the petitioner's liberty of action and constitute restraints upon his freedom which are not suffered by members of the public generally").

19

In *De Paunto v. People of State of Michigan*, 332 F.2d 396 (6th Cir. 1964), the court held a prisoner—who was paroled by the state on the conviction he sought to challenge in a federal habeas corpus action while confined in a federal prison—was not in state custody because the state paroled him "not into the custody of the state parole board, but into the custody of federal authorities" and so "[n]either the parole board nor any other state agency is imposing any restrictions on [him]." 332 F.2d at 397. As a result, he was not in state custody and could not pursue habeas relief against the state officials. 332 F.2d at 397.

Here, the State lodged a detainer imposing a restriction on LaPointe. And unlike *De Paunto*, the Kansas sentence was pending when LaPointe filed his motion. We note further the State developed no factual record about its detainer, so we can only look to a detainer's general constraints. Under federal law:

> "The Director of the Bureau of Prisons shall order that a prisoner who has been charged in an indictment or information with, or convicted of, a State felony, be transferred to an official detention facility within such State prior to his release from a Federal prison facility if—
>
> (1) the transfer has been requested by the Governor or other executive authority of the State;
>
> (2) the State has presented to the Director a certified copy of the indictment, information, or judgment of conviction; and
>
> (3) the Director finds that the transfer would be in the public interest.
>
> "If more than one request is presented with respect to a prisoner, the Director shall determine which request should receive preference. The expenses of such transfer shall be borne by the State requesting the transfer." 18 U.S.C. § 3623 (2012).

20

The State did not show whether it had made a formal request for transfer when LaPointe moved for testing or whether such a request was granted. And the State did not establish it was probable or even a substantial possibility that LaPointe would not be released to Kansas authorities when his federal sentence ended. But even if LaPointe were not returned by federal authorities, he would still be subject to arrest and confinement in Kansas for execution of his sentence. See K.S.A. 2017 Supp. 22-3427(a) (providing county sheriff has duty to cause person subject to sentence to be confined).

> "When interpreting statutes, [the court] begin[s] with "'the fundamental rule that [courts] give effect to the legislature's intent as it is expressed in the statute. Courts must apply a statute's language when it is clear and unambiguous, rather than determining what the law should be, speculating about legislative intent, or consulting legislative history.'" *State v. Williams*, 298 Kan. 1075, 1079, 319 P.3d 528 (2014). [The court] derive[s] legislative intent by first applying the meaning of the statute's text to determine its effect in a specific situation. 'It is only when the language is unclear or ambiguous that the court employs the canons of statutory construction, consults legislative history, or considers other background information to ascertain the statute's meaning.' *Whaley v. Sharp*, 301 Kan. 192, 196, 343 P.3d 63 (2014)." *Collins*, 303 Kan. at 474.

We hold LaPointe was in state custody within the statute's meaning because of the State's detainer and the usual procedures attendant to such detainers. The district court did not err in deciding LaPointe was in state custody.

*K.S.A. 2017 Supp. 21-2512 does not apply to LaPointe*.

When ordering LaPointe's requested DNA testing, the district court acknowledged K.S.A. 2017 Supp. 21-2512 was written to apply only to those convicted of first-degree murder or rape and that LaPointe was not convicted of those crimes. So to expand the statute's application, the court relied on *Cheeks I*, in which a divided court expanded

21

postconviction DNA testing to second-degree murder to avoid perceived equal protection problems. *Cheeks I*, 298 Kan. at 11. The district court specifically held LaPointe "is similarly situated to the defendant in *Cheeks [I]*, and therefore there is no rational basis for denying [LaPointe's] motion for post-conviction DNA testing."

The district court read *Cheeks I* to require focus on the punishment imposed for a crime when determining whether a person is similarly situated to another for equal protection purposes. The court then reasoned:

> "[LaPointe] was sentenced to a term of 245 months for the aggravated robbery and aggravated assault conviction[s]. At the time [LaPointe] was sentenced, an individual convicted of first-degree murder could be eligible for parole after serving either 15 or 20 years, depending on the date of the offense. K.S.A. 22-3717(2). In addition, at the time [LaPointe] was sentenced, a defendant convicted of a severity level 1 or level 2 rape could potentially serve less prison time than [LaPointe] for his aggravated robbery and aggravated assault convictions."

We undertake de novo review of the State's question reserved on the district court's postconviction DNA testing order, presuming the statute is constitutional and resolving all doubts in favor of upholding it. The party challenging the statute bears a weighty burden. *Cheeks I*, 298 Kan. at 4.

The Fourteenth Amendment to the United States Constitution provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." To comply, a state must treat similarly situated persons similarly. *Cheeks I*, 298 Kan. at 5.

A court engages in a three-step process when reviewing an equal protection claim. First, it considers whether the legislation creates a classification resulting in different treatment of similarly situated individuals. If the statute treats "'arguably

indistinguishable'" individuals differently, the court determines next the appropriate level of scrutiny to assess the classification by examining its nature or the right at issue. 298 Kan. at 4-5. Then, the court applies that level of scrutiny to the statute. 298 Kan. at 5. In three prior postconviction DNA testing cases, this court addressed whether a person is similarly situated to one convicted of first-degree murder or rape. See, e.g., *Cheeks I*, 298 Kan. 1; *State v. Salas*, 289 Kan. 245, 210 P.3d 635 (2009); *State v. Denney*, 278 Kan. 643, 101 P.3d 1257 (2004).

In *Denney*, the earliest case, the court held a person convicted of aggravated criminal sodomy for "penetrating his victims' anuses with his male sex organ" was "arguably indistinguishable from those people who are convicted of rape with the male sex organ." *Denney*, 278 Kan. 653-54. This decision turned on an assessment that the crime's facts equated to rape, for which testing was available. 278 Kan. at 653. In the next case, the *Salas* court used the same analytical approach to hold a defendant convicted of intentional second-degree murder was not similarly situated because first-degree murder's premeditation requirement distinguished it from second-degree murder. *Salas*, 289 Kan. at 250-51.

But with *Cheeks I* the focus on factual elements changed. A court majority decided to base its analysis on the punishment meted out. In that case, Cheeks was convicted of malicious second-degree murder prior to the Kansas Sentencing Guidelines Act and sentenced to an indeterminate term of imprisonment of 15 years to life. Cheeks argued his maximum, pre-KSGA life sentence made him similarly situated to someone sentenced pre-KSGA to life imprisonment for first-degree murder. The majority agreed, reasoning that K.S.A. 21-2512's "purpose is to provide an opportunity for exoneration to innocent individuals convicted of severe crimes," and so "the *relevant trait for [its] similarly situated analysis is the sentence imposed by the district court and not the elements of the crimes.*" (Emphasis added.) 298 Kan. at 6-7.

23

In LaPointe's case, the district court relied on *Cheeks I*'s punishment rationale because LaPointe was sentenced to 245 months for his crimes. But this only underscores that rationale's infirmities, as noted in the *Cheeks I* dissents. See *Cheeks I*, 298 Kan. at 16-17 (Nuss, C.J., dissenting) (objecting to extending statute to situations in which the Legislature expressed a clear contrary intent); 298 Kan. at 19 (Rosen, J., dissenting) ("Although the majority appears to limit its decision to others subject to 'severe' penalties, it will require judicial contortions to exclude most, if not all, incarcerated felons from the scope of this decision."); 298 Kan. at 21 (Biles, J., dissenting) ("The majority's logic will soon require our district courts to reexamine a much larger range of convictions than plainly called for by the statute. And the finality of that larger group of convictions will remain an open question while the proceedings drag on from the district court to the appellate courts.").

LaPointe's sentence was based on his criminal history—not just the crimes themselves. Aggravated robbery is a severity level 3 felony. K.S.A. 21-3427. Depending on criminal history, the presumptive, grid-box sentence for the offense, both now and when LaPointe committed it, could range from 55 to 247 months' imprisonment. K.S.A. 2017 Supp. 21-6804; K.S.A. 2000 Supp. 21-4704. Aggravated assault is a severity level 7 felony. K.S.A. 21-3410. The sentence for aggravated assault could range from presumptive probation with an underlying 11-month prison term through 34 months' imprisonment. K.S.A. 2017 Supp. 21-6804; K.S.A. 2000 Supp. 21-4704. LaPointe's criminal history score was an A, and he got the 245-month sentence because of consecutive sentencing.

But the crimes covered by the DNA testing statute would always carry greater punishments than LaPointe's crimes—all other things being equal. Consider offenders with identical criminal history scores. The presumptive sentencing range for a severity

24

level 3 offense never overlaps with the sentencing range for a severity level 2 or greater offense. See K.S.A. 2017 Supp. 21-6804 (e.g., sentences for offender with no record for severity level 3 offense range from 55-61 months, and for severity level 2 offense from 109-123 months; and for criminal history A, sentences for severity level 3 range from 221-247 months, and for severity level 2 from 442-493 months). In other words, LaPointe bootstraps his way into the *Cheeks I* rationale only because he has a more extensive criminal history based on his prior crimes.

This may be a logical extension of *Cheeks I*, but it simply makes no sense to exclude from DNA testing persons with no criminal history who commit the same crimes, while granting testing to persons with significant criminal records. And if the answer to the person with no criminal history is simply providing postconviction DNA testing to anyone as a policy preference to protect the innocent, that reasoning moves the discussion from ensuring equal protection of the laws to raw legislating. The *Cheeks I* majority's analysis fails for that most basic of reasons.

The test-everyone approach also would conflict with the recognition in our caselaw that the Legislature has authority to grant a limited right to access postconviction DNA testing procedures without violating equal protection principles. See *Salas*, 289 Kan. at 251 (holding individual seeking postconviction DNA testing failed to show he was similarly situated to those who have a statutory right to testing); see also *Cheeks I*, 298 Kan. at 18-19 (Rosen, J., dissenting) ("[I]t lies within the discretion of the legislature to decide how to allocate the judicial and scientific resources for postconviction relief. Keeping in mind that there is no inherent constitutional right to postconviction DNA testing, the decision of the legislature to set limits on which crimes qualify for that testing reflects a policy decision that lies outside the scope of this court's review.").

25

We overrule *Cheeks I* to the extent it held the sentence imposed determines whether an offender is similarly situated to a person to whom postconviction DNA testing is statutorily available. Based on this, we reject LaPointe's argument that his sentence alone renders him similarly situated to a person whom the Legislature has afforded the right, i.e., a person convicted of first-degree murder or rape.

Finally, although we confine our analysis to the distinction raised by LaPointe, we note he also could not succeed in establishing he is similarly situated by arguing for an extension of *Denney*, which focused on the similarities of the crimes being compared, i.e., the crime of conviction and the crimes for which the Legislature granted the right to testing. *Denney*, 278 Kan. at 652-54 ("[W]e must first examine the two crimes to determine if, under the facts of the instant case, they are 'arguably indistinguishable.'").

Using the elements approach, the *Denney* court, which was comparing aggravated criminal sodomy to rape, concluded the two crimes were substantially similar, explaining:

> "In short, rape can consist of something less than voluntary consent to penetration of the female sex organ by the male sex organ, while aggravated criminal sodomy can consist of something less than voluntary consent to penetration of another female bodily orifice by the male sex organ. Here, Denney clearly committed the latter: penetrating his victims' anuses with his male sex organ. Accordingly, we hold that Denney, convicted of aggravated criminal sodomy under such circumstances, is arguably indistinguishable from those people who are convicted of rape with the male sex organ." *Denney*, 278 Kan. at 653-54.

Applying that analysis to LaPointe, his crimes are distinguishable from first-degree murder and rape for the obvious reason they involved neither a killing nor sexual intercourse. So even applying the *Denney* approach, LaPointe is not similarly situated

26

with a person convicted of first-degree murder or rape for the postconviction DNA testing statute. See *Salas*, 289 Kan. at 251 ("[W]e reject Salas' argument that premediated first-degree murder and intentional second-degree murder are substantially similar as to the necessary elements and are arguably indistinguishable on that basis.").

Accordingly, LaPointe was not entitled to DNA testing under K.S.A. 2017 Supp. 21-2512(a) based on the punishment imposed for his convicted offenses, i.e., aggravated robbery and aggravated assault. We overrule *Cheeks I* as explained, which served as the district court's basis for its order.

The judgment of the Court of Appeals affirming the district court is affirmed on the issue subject to our review. Judgment of the district court is affirmed. The State's cross-appeal is sustained in part and denied in part on the questions reserved.

* * *

BEIER, J., concurring in the result:  I agree with the majority's treatment of the first two issues in this case. I write separately because I agree only with its result on the third issue and disagree with its rationale.

On the first issue, although I might have decided the question of the relief due defendant Jack R. LaPointe as a result of the DNA tests differently, my personal druthers do not an abuse of discretion make. Our deferential standard of review begins and ends the matter.

On the second issue, I believe the state detainer has the effect described by the majority. Although LaPointe's actual residence was a federal correctional facility at the

27

time he filed his motion for DNA testing, he also qualified as "in state custody" under K.S.A. 2017 Supp. 21-2512(a).

On the third issue, the majority need not overrule *State v. Cheeks*, 298 Kan. 1, 310 P.3d 346 (2013), as it purports to do at least in its introduction to its opinion, in order to hold that LaPointe was ineligible to file a motion for DNA testing. Under an Equal Protection Clause analysis, LaPointe was not similarly situated to defendants in the first-degree murder and rape cases for which legislators wrote the DNA testing statute, and its provisions should not be extended to him. His eligibility for a long sentence was largely attributable to his extensive criminal history, not to the severity level and long sentences assigned to his crimes in this case.

LUCKERT and JOHNSON, JJ., join the foregoing concurrence.