NOT DESIGNATED FOR PUBLICATION

No. 121,709

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOHN R. PRINE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed July 24, 2020. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., STANDRIDGE and POWELL, JJ.

PER CURIAM: John R. Prine was convicted after a second jury trial of rape, aggravated criminal sodomy, and aggravated indecent liberties with a child. After his convictions were upheld on direct appeal, Prine sought postconviction DNA testing of the victim's clothing. The testing failed to produce any definitive results and only showed the presence of an unknown male's DNA. In light of these results, and after considering the evidence presented at trial, the district court determined the DNA test results were inconclusive and denied Prine's request for a hearing. Prine now appeals that denial. After a careful review of the record, we find no abuse of discretion and affirm the district court.

FACTUAL AND PROCEDURAL BACKGROUND

This is Prine's third sojourn to the appellate courts. See *State v. Prine*, 287 Kan. 713, 200 P.3d 1 (2009) (*Prine I*); *State v. Prine*, 297 Kan. 460, 303 P.3d 662 (2013) (*Prine II*). In 2004, Prine was convicted of rape, aggravated criminal sodomy, and aggravated indecent liberties with a child for acts he committed against A.C. but received a new trial after the Supreme Court held the district court erred by admitting evidence of Prine's prior sexual abuse of his daughter and his younger half-sister. *Prine I*, 287 Kan. at 720, 739-40.

At the second trial, the following facts were established:

*"Crimes and Investigation*

"J.C.'s babysitter fell through. J.C.'s then-fiancé (now husband), Anthony, had a best friend: defendant John Prine. J.C. contacted Prine, who agreed to act as a backup babysitter. She left Prine with her two babies and her 6-year-old stepdaughter, A.M.C. Anthony, A.M.C.'s father, picked her up after lunch and took her to kindergarten. J.C.'s mother, A.M.C.'s future grandmother, picked A.M.C. up from school to take her back home, where Prine was still babysitting. On the way home, A.M.C. told her grandmother that she did not want to go home because Prine had touched her. The grandmother relayed this information to J.C., who immediately came home. J.C. told Prine he was free to go, which he did after taking a shower. Then J.C. and Anthony took A.M.C. to the doctor for a medical examination. The examination revealed no injury, but J.C. and Anthony filed a police report, as the doctor suggested.

"Detective John Taylor interviewed A.M.C. at the police station. The interview was videotaped. They talked about truth and lies, and about good and bad touching. A.M.C. told Taylor that 'John' had given her 'bad touches.' She told Taylor that Prine had touched her on her 'front'—which she identified with 'where she went pee from'—with his fingers, his tongue, and his tummy. She demonstrated how he licked his two fingers

and touched her front, and she described how he 'would pull my front open and lick inside.'

"Taylor also interviewed Prine, who denied ever inappropriately touching A.M.C. Prine became annoyed and left the police station, but he returned later to make a report concerning illegal activity at a grocery warehouse where Anthony worked. Specifically, he reported that Anthony was stealing from the warehouse.

"Several weeks later, Taylor interviewed Prine again. At this time, Prine offered information about unintentional conduct that might have formed the basis for A.M.C.'s allegations. One time, he said, A.M.C. had a swimsuit on and slid down his arm and the side of her swimsuit moved, exposing her vagina; on other occasions, Prine had roughhoused with A.M.C. and his hand might have slipped; and one time A.M.C. got peanut butter on her face, and Prine had licked his thumb and wiped it off. Prine also suggested that A.M.C.'s father might have been the one who molested her.

"Between the time that A.M.C. made her initial allegations about Prine and the time that she was interviewed, J.C. called T.M. and informed her about A.M.C.'s accusations. T.M. was Prine's ex-wife and had two children with him. She and defendant had been involved in a bitter custody dispute. T.M.'s daughter, S.M., had previously made allegations that Prine molested her. Taylor interviewed S.M. The interview was recorded. At the time of her interview, S.M. was 9 years old. She stated that defendant— her father—had sex with her when she was little. When she was 4 or 5 years old, he would place her on top of his bare body and she would be naked from the waist down and she could feel his penis on her vagina.

"Taylor also interviewed Prine's younger sister, J.S., who had previously reported being molested by defendant. At the time of her interview, J.S. was 27 years old. She indicated that, from the time she was about 4 years old until she was 10 or 11, defendant sexually abused her. He would lick two fingers and touch her vagina; touch his penis to her vagina; put his mouth and lips on her vagina; and/or wipe saliva on her vagina. She also described him forcing her to have oral sex with him by placing his penis in her mouth. She stated that two of her brothers had, at least on one occasion, witnessed this

3

abuse. When J.S. was 15 years old, she filed a police report in her hometown in Montana, detailing Prine's sexual abuse of her.

. . . .

*"Retrial*

"At Prine's August 2009 retrial, A.M.C. again testified. She told the jury that Prine touched her 'private,' on the inside and the outside, and with his fingers, his tongue, and his stomach. She also said that he would lick his two fingers and touch her private parts.

"Steve Edwards, a clinical social worker who had performed a sexual abuse evaluation on A.M.C., testified that he interviewed her about good touching and bad touching, and about body parts. She told Edwards that 'John,' her dad's friend, was 'doing it to her,' and that it happened more than one or two times and in 'lots of places' in her house. A.M.C. told Edwards that Prine had touched her front part with his fingers, his tongue, and his tummy.

"In addition, on retrial, on the State's motion and over defendant's continuing objection, the district judge allowed S.M. and J.S. to testify about Prine's uncharged abuse of them. The judge apparently relied upon the freshly amended K.S.A. 60–455, but the record before us contains neither a written ruling on the State's motion nor a transcript of a proceeding in which the motion was heard and granted. The State's motion to admit the evidence had argued it was admissible under the newly amended statute because subsection (d) required it to be only 'relevant and probative,' not 'strikingly similar'; and the evidence was relevant and probative to prove intent, lack of mistake or accident, and/or plan.

"S.M., 14 at the time of retrial, testified that Prine would 'tak[e] me into the bedroom and tak[e] his clothes off, tak[e] mine off, and then [sit] me on the bed and then hav[e] sex, basically.' Edwards, the social worker, testified that he had counseled S.M. and around February 2003 performed a sexual abuse evaluation on her. S.M. had told him that 'John,' who was her biological father, would force her to come into a bedroom, would

put honey on his private part, and would force her to 'get on his private.' When S.M. testified during the retrial, she said that she remembered telling Edwards about honey but she did not remember 'where it [fit] in.'

"S.M.'s mother testified about how she learned that S.M. had been molested, and how it was that J.C. eventually contacted her.

"J.S. testified that from about the time she was 4 years old until she was about 10, Prine, who was her half-brother, would sexually abuse her. He would force her to perform oral sex on him; he would perform oral sex on her; he would lick his fingers and touch her between the legs; and he would rub his penis between her legs. She testified that later, when she was 15, she made a report about this abuse to the police in Montana where she lived. She testified that two of her brothers had witnessed at least one incident.

"J.S.'s half-brother, M.S., testified that in 1983, when he was about 12 years old and J.S. was about 6, he remembered looking through a bedroom door and seeing her performing oral sex on defendant.

"N.P., the other brother who had allegedly witnessed the 1983 incident, testified for the defense. He denied witnessing Prine abuse J.S. and said M.S. had told him that no abuse happened.

"Prine also testified during his retrial. He described his family relationships and his friendship with Anthony. He testified about his relationship with J.C., and how she began making advances toward him, which he rebuffed. He testified about the events of December 11, 2003, when he babysat J.C.'s and Anthony's children, and he denied licking or inserting his fingers into A.M.C.'s vagina. He testified about having offered possible explanations to the police about 'where [such] an idea could end up coming from'; again, a swimsuit malfunction, roughhousing, and a 'spit bath.' He testified that, after these allegations arose, he reported that Anthony was stealing from the warehouse where he worked, and that he did so because he was angry. He denied suggesting that Anthony had molested A.M.C. He also denied sexually molesting either his daughter, S.M., or his half-sister, J.S.

5

"The jury was instructed that it could consider evidence of uncharged sexual offenses 'solely for the purpose of proving John Prine's intent, plan, absence of mistake or accident.' Prine did not object to the language of this instruction. Prine was again convicted, and he was sentenced to 387 months' imprisonment." *Prine II*, 297 Kan. at 463-67.

Prine appealed, and his appeal was transferred to the Kansas Supreme Court. This time, Prine's convictions were affirmed. 297 Kan. at 480-81.

On January 17, 2014, Prine filed a pro se motion for postconviction DNA testing of the victim's clothing. Prine was appointed counsel, who filed two additional petitions for DNA testing on Prine's behalf. The district court ordered A.C.'s jeans and underwear be tested. The initial results were negative for semen, but since Prine's convictions were for digitally penetrating and performing oral sex on A.C., semen was not expected to be present. The district court then ordered the clothes be retested for any DNA evidence.

The district court held a hearing on the DNA test results on May 24, 2019. At the hearing, the State read into the record the results of the DNA testing:

"The DNA testing established the following: No DNA profile was obtained from the swabs from the outside of the victim's jeans and swabs from the outside of her underwear. Therefore, no comparison could be made from these items. Partial DNA profile was made from the swabs of the inside of her jeans. This partial DNA profile contained an insufficient genetic information for comparison. Therefore, no conclusions can be made from this item. A partial mixed DNA profile was obtained from the swabs from inside of the victim's underwear. The partial mixed DNA profile contained insufficient genetic information for comparison. Therefore, no conclusions could be made regarding the item. A DNA profile was obtained from the swabs from John Prine and also the swabs from the victim. No male DNA haplotype, haplotype, H-A-P-L-O-T-Y-P-E . . . [w]as obtained from the swabs on the outside of the jeans, therefore, no comparison could be made to those items. A partial male DNA haplotype was obtained from swabs from

6

the outside of the underwear and the swabs from the inside of the underwear. So there was some type of a male DNA component on the outside and inside, but these partial haplotypes contained insufficient genetic information for comparison, therefore, no conclusion could be reached regarding those items."

The district court found the DNA evidence was inconclusive under K.S.A. 21-2512(f)(3) and denied Prine's request for an evidentiary hearing because the results did not create a substantial question of innocence.

Prine timely appeals.

### DID THE DISTRICT COURT ABUSE ITS DISCRETION BY DENYING PRINE AN EVIDENTIARY HEARING?

On appeal, Prine argues the district court should have granted him an evidentiary hearing to determine if a substantial question of his innocence existed because Prine's DNA should have been obtained from the swabs from A.C.'s underwear and its absence bolsters his claim of innocence. The State responds that the absence or presence of Prine's DNA proves nothing, noting the jury found Prine guilty while knowing the State did not test A.C.'s clothes for DNA evidence. The State also suggests the presence of unidentifiable male DNA could have strengthened the State's case because it provided some proof a male had contact with A.C.'s underwear.

*Standard of Review*

We review a district court's decision whether to grant an evidentiary hearing under K.S.A. 2019 Supp. 21-2512 for abuse of discretion. *State v. LaPointe*, 309 Kan. 299, 306, 434 P.3d 850 (2019). Abuse of discretion exists when the district court's action (1) is one where no reasonable person would take the view adopted by the district court, (2) is

7

based on an error of law, or (3) is based on an error of fact. *State v. Woodring*, 309 Kan. 379, 380, 435 P.3d 54 (2019). The party asserting an abuse of discretion exists bears the burden of proving it. See *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018). When evaluating the evidence, we do "not reweigh evidence or assess witness credibility." *Woodring*, 309 Kan. at 380.

*Analysis*

The DNA results contained a partial DNA profile with insufficient genetic information for comparison. But the test did determine the DNA profiles from the swabs on the outside and on the inside of A.C.'s underwear contained a partial male DNA haplotype. Because the DNA results revealed male DNA haplotype—but were not sufficient to determine whose DNA it was—the district court found the DNA test results were inconclusive and denied Prine's request for a hearing.

K.S.A. 2019 Supp. 21-2512(f) sets forth the procedures a district court should take depending on whether the DNA testing results are unfavorable, favorable, or inconclusive. If the test results are inconclusive,

> "the court may order a hearing to determine whether there is a substantial question of innocence. If the petitioner proves by a preponderance of the evidence that there is a substantial question of innocence, the court shall proceed as provided in subsection (f)(2)." K.S.A. 2019 Supp. 21-2512(f)(3).

The district court has discretion in ordering a hearing when DNA test results are inconclusive. If the district court does order a hearing, it must determine whether a substantial question of innocence exists. In such a hearing, the defendant has the burden to prove "'a substantial question of innocence'" by a preponderance of the evidence. *Haddock v. State*, 282 Kan. 475, 499, 146 P.3d 187 (2006). A preponderance of the

evidence means the evidence shows """a fact is more probably true than not true."""
*Nauheim v. City of Topeka*, 309 Kan. 145, 152, 432 P.3d 647 (2019).

Although Prine argued before the district court that the results of the DNA testing were favorable, he does not take issue with the district court's determination before us. Instead, Prine alleges the district court abused its discretion because it did not order an evidentiary hearing to determine whether a substantial question of his innocence existed. Prine does not allege how the district court abused its discretion, nor does he allege the district court committed an error of fact. Because we see no legal error on the part of the district court as it had the discretion to order a hearing under K.S.A. 2019 Supp. 21-2512(f)(3), Prine has the difficult task of convincing us that no reasonable person would agree with the district court's decision not to hold an evidentiary hearing.

The jury convicted Prine without DNA evidence. Taylor testified the police collected A.C.'s clothes but did not test for DNA because it was unlikely to be helpful since the police expected Prine's DNA to be on A.C. from him babysitting her. Taylor admitted no one tested for any DNA on A.C.'s underwear. Defense counsel raised this issue before the jury in both his opening and closing statements. Despite the lack of DNA evidence, the jury convicted Prine on all three counts.

It is unlikely the DNA test results could raise a substantial question of Prine's innocence. Prine's defense centered on asserting he never had any sexual contact with A.C. He testified he did not commit any sexual acts on A.C. and rejected the allegations of L.S. and S.M. that he sexually abused them. When testifying, Prine admitted he told the police about incidents when he touched A.C.'s vagina or licked his finger and touched her face. He offered these events as innocent explanations for A.C.'s claims.

The DNA test results neither truly help nor hurt Prine's case. On one hand, Prine could have used this evidence to argue, as he does here, that if he had performed oral sex

9

on A.C. or had digital contact with her vagina, his DNA should have been present. The lack of DNA evidence, he claims, shows he was not guilty. On the other hand, the State could have argued the evidence shows some male touched her underwear, and A.C.'s recounting said that man was Prine. Additionally, an argument could have been made suggesting the male DNA profile came from the doctor touching her underwear when he performed a sexual assault examination on A.C. In short, the DNA test results likely would not have added much weight to the trial. The jury listened to the testimony of A.C. and several other witnesses. It also listened to Prine's testimony. In the end, it determined Prine was guilty. Inconclusive evidence of unknown male DNA on the outside and inside of A.C.'s underwear was unlikely to change the jury's mind.

The DNA test results do not raise a substantial question of Prine's innocence, and the district court did not abuse its discretion in refusing to conduct an evidentiary hearing.

Affirmed.