IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,731

STATE OF KANSAS,
*Appellee*,

v.

RAMON RODRIGUEZ,
*Appellant*.

SYLLABUS BY THE COURT

1.

A district court is generally required to make findings of fact and conclusions of law sufficient to allow meaningful appellate review.

2.

Under K.S.A. 2014 Supp. 21-2512(f)(2), a petitioner seeking a new trial has the burden of establishing (1) the new DNA test results are favorable and (2) those results are of such materiality that a reasonable probability exists the new evidence would result in a different outcome at trial. A district court's denial of a new trial request under this statute is reviewed for abuse of discretion, *i.e.*, whether no reasonable person would have taken the view adopted by that court.

3.

Under the facts of this case, the district court did not abuse its discretion in denying the defendant's motion for new trial.

Review of the judgment of the Court of Appeals in an unpublished opinion filed December 21, 2012. Appeal from Johnson District Court; PETER V. RUDDICK, judge. Opinion filed June 5, 2015.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, argued the cause and was on the brief for appellant, and *Ramon Rodriguez*, appellant pro se, was on the supplemental brief.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, C.J.: The district court denied Ramon Rodriguez' motion for new trial that was based on the results of postconviction DNA testing under K.S.A. 2014 Supp. 21-2512(f). The Court of Appeals affirmed, agreeing with the district court that the new DNA evidence was unlikely to result in a different jury verdict on retrial.

Because the district court did not abuse its discretion in denying the motion, we affirm the lower courts.

## FACTS

A jury convicted Rodriguez of one count each of rape, aggravated sodomy, and criminal restraint in 2002. The victim, J.S., fell asleep after a party at a home where Javier Vallejos was house sitting for relatives. J.S. testified that she awoke in the bedroom to find party attendee Rodriguez on top of her and using his knees to pin her shoulders. According to J.S., he digitally penetrated her vagina, placed his penis in her mouth, ejaculated, and then forced her to swallow his semen.

No physical evidence implicated Rodriguez in the crime. Instead, the State relied primarily on J.S.'s testimony and recorded statement in which she identified Rodriguez as

2

her attacker. The State provided corroboration through the testimony of party host Vallejos and Jose Yannes, who also was in the house at the time of the crimes.

Rodriguez' theory of defense was that someone else raped J.S. He attempted to discredit her identification by eliciting testimony that she was intoxicated and confused and that it was too dark in the bedroom for her to indentify her attacker. On direct appeal, the Court of Appeals reversed Rodriguez' criminal restraint conviction as multiplicitous with his rape conviction but otherwise affirmed. *State v. Rodriguez*, No. 85,125 (Kan. App. 2002) (unpublished opinion) (*Rodriguez I*).

Since then, Rodriguez has sought postconviction relief on multiple occasions. In 2004, he filed a motion under K.S.A. 60-1507 alleging ineffective assistance of trial counsel. The district court denied the 1507 motion after an evidentiary hearing, and a Court of Appeals panel affirmed. *Rodriguez v. State*, No. 96,587, 2008 WL 3367543 (Kan. App. 2008) (unpublished opinion) (*Rodriguez II*). Among other things, Rodriguez argued his counsel was ineffective for failing to request DNA testing to determine the origin of hair found on the bed where J.S. was raped. Forensic testing at the time of trial eliminated Rodriguez as the source of the hair. But he argued his counsel should have tried to identify the particular source of the hair to further support his theory that someone else raped J.S. In rejecting Rodriguez' argument, the panel reasoned that, because the tests did not implicate him, it was unnecessary to perform further tests to identify the hair's source. 2008 WL 3367543, at *8.

Before Rodriguez' 1507 motion was resolved, he also filed a motion for post-conviction DNA testing under K.S.A. 21-2512. He requested testing of blood and saliva samples collected from Vallejos at the time of trial but never analyzed. The district court denied the motion after a preliminary hearing, concluding that additional testing would not produce noncumulative, exculpatory evidence as required by K.S.A. 21-2512(c).

3

A panel of the Court of Appeals different from the one rejecting his 1507 motion then reversed and remanded the case to the district court for an evidentiary hearing. *State v. Rodriguez*, No. 100,636, 2009 WL 3630919 (Kan. App. 2009) (unpublished opinion) (*Rodriguez III*). It reasoned that because no physical evidence linked Rodriguez to the attack, J.S.'s identification of him as her attacker could be undermined by DNA testing linking another person to the crime scene. 2009 WL 3630919, at *6-7. It further opined: "Unless there is a reason (not related to J.S.'s sexual assault) for why Vallejos' DNA would be present in his sister's and brother-in-law's bedroom, finding his DNA on the items recovered from the bedroom would likely constitute noncumulative, exculpatory evidence relevant to Rodriguez' claim that he was wrongfully convicted of sexually assaulting J.S." 2009 WL 3630919, at *7.

On remand from *Rodriguez III*, the district court ordered additional DNA testing be performed to compare Vallejos' blood and saliva samples to the samples of biological material found at the crime scene. It agreed with Rodriguez' counsel that the only reason Vallejos' DNA should not have been tested at the time of the trial would be if there was a nonsexual reason for his DNA being in the bedroom where J.S. was raped. Five semen stains were tested in this later analysis of bedroom materials—one from a pillowcase, one from a green sheet, one from a white flowered sheet, and two from a comforter.

After the postconviction testing was complete, the district court held an evidentiary hearing. Regarding Rodriguez and J.S., the crime lab analyst testified this later testing confirmed that neither person's DNA was present on any of these bedroom items.

As for Vallejos, the lab analyst began by explaining that every semen sample essentially contains two categories of biological material—sperm cells and all other types

4

of cells. These cells can be separated into "sperm fractions" and "non-sperm fractions." The analyst tested both the sperm and non-sperm fractions for each of the five stains. For the pillowcase sample, the analyst determined that Vallejos was "included as a contributor" in the non-sperm fraction.

But the analyst could draw no such conclusion from the rest of the testing results. As to the sperm fraction of this pillowcase sample, "no conclusion [could] be offered as to whether [] Vallejos [was] the source of the partial DNA profile." The same "no conclusion" applied to the non-sperm fraction of the sample from the white flowered sheet. And Vallejos was eliminated as a contributor to that sheet's sperm fraction. Moreover, he was also eliminated as a contributor to the sperm and non-sperm fractions of the remaining three samples from the green sheet and comforter.

The analyst further explained that non-sperm fractions are particularly probative in cases of oral or vaginal penetration. This is because the mouth and vagina slough a significant amount of cellular material. When ejaculation occurs, semen—which contains both sperm and non-sperm cells—mixes with cellular material from the mouth or vagina. A mixture of the non-sperm cells from the semen and those cells from the mouth or vagina is typically found in the non-sperm fraction of the crime scene sample. And this mixture makes it possible to identify both the attacker and the victim.

Regarding the non-sperm fraction of the pillowcase stain—the only one for which the analyst included Vallejos as a contributor—the analyst also concluded his DNA was mixed with at least one other individual's. So if it was J.S.'s DNA found in this sample, it would suggest Vallejos was her attacker. But J.S. was excluded as a contributor to this sample. Accordingly, the analyst concluded it was "very unlikely" that sample was created contemporaneously with J.S.'s rape, *i.e.*, it was placed on the pillowcase at a different time.

Relying on the analyst's testimony, the State argued the results of the post-conviction DNA testing were unfavorable because they did not help Rodriguez. Specifically, it claimed that because the jury knew that the DNA testing eliminated Rodriguez as the source of the semen stains, it presumably took that knowledge into account during its deliberations.

The State also argued that the lack of a mixture of DNA from Vallejos and J.S. indicated the pillowcase stain containing his DNA was likely unrelated to the assault. The State further noted it was not surprising Vallejos' DNA would be found in the bed where he was house sitting. Ultimately, the State concluded whatever biological material was linked to Vallejos "is of such little significance given what the jury heard at trial and given what their result was, that there is no way that it would result in a different outcome."

Rodriguez' counsel responded by drawing a distinction between the general evidence Vallejos was staying at the house and the purported lack of specific evidence Vallejos had actually been in the bedroom:

> "I remember that Mr. Vallejos was staying at the *house*. I do not recall the record indicating that he was staying *in that room. I think that is a distinction that should be carefully considered. If he was not staying in that room and he has potentially a sperm fraction on [the pillowcase], I think that is problematic, Judge. . . .*
>
>     . . . .
>
> "I don't believe the record adequately supports that Mr. Vallejos' non-sperm fraction and potential[] sperm fraction should be on these items found in the bedroom, or I don't believe the record was clear that he was staying it—he was staying at the house,

6

but *I don't think the record indicates that he was sleeping or living in that bedroom.*" (Emphasis added.)

The district court agreed counsel's distinction was important. But it concluded "there does seem to be a logical explanation why Vallejos' DNA would be in the bedroom and in that bed." It further reasoned the DNA test results did not link Vallejos to the assault because, while his DNA was on the pillowcase, there was no DNA from J.S. in that sample. Ultimately, the district court denied Rodriguez' motion for new trial, concluding the new information that Vallejos' DNA was on the pillowcase was "unlikely to have yielded or would yield in the event of a new trial a different outcome."

A panel of the Court of Appeals affirmed the district court. *State v. Rodriguez*, No. 106,731, 2012 WL 6734515 (Kan. App. 2012) (unpublished opinion) (*Rodriguez IV*). It held that when the new DNA evidence was considered with all of the other evidence, there was no reasonable probability the new evidence would result in a different outcome at trial. It agreed with the district court's rationale, explaining that the impact of the new DNA evidence

"would likely be minimal for two reasons. First, there was a logical reason why Vallejos' DNA would be found in the bedroom because Vallejos was staying at the house when the crime was committed. Second, and more importantly, the pillowcase stain was not clearly related to the crime because J.S.'s DNA was not found in the stain. As [the DNA analyst] testified, it was 'very unlikely' that the pillowcase stain was contemporaneous with the crime." 2012 WL 6734515, at *6.

We granted Rodriguez' petition for review under K.S.A. 20-3018, providing us jurisdiction under K.S.A. 60-2101(b).

More facts will be added as necessary to the analysis.

7

Issue 1: *The district court made sufficient findings of fact and conclusions of law to facilitate meaningful appellate review.*

Rodriguez claims the district court failed to make specific findings of fact or conclusions of law as required by Supreme Court Rule 183(j) (2014 Kan. Ct. R. Annot. 285). Accordingly, he requests we remand his case to the district court to make clear findings and conclusions. The State counters that Supreme Court Rule 183(j) does not apply and, in any case, there was no ambiguity in the district court's findings or order.

*Standard of review*

Rodriguez' argument about the sufficiency of the district court's findings of fact and conclusions of law initially requires us to interpret Supreme Court Rule 183(j). The interpretation of a Supreme Court Rule is a question of law over which we exercise unlimited review. *Fischer v. State*, 296 Kan. 808, 815, 295 P.3d 560 (2013) (citing *Kansas Judicial Review v. Stout*, 287 Kan. 450, 460, 196 P.3d 1162 [2008]).

*Discussion*

On its face, Rule 183(j) applies to motions for habeas relief filed under K.S.A. 60-1507, not motions for new trial like Rodriguez' filed under K.S.A. 2014 Supp. 21-2512. See *State v. Hoge*, 283 Kan. 219, 221-22, 150 P.3d 905 (2007) (Rule 183 "relates solely to actions under K.S.A. 60-1507"). But see *State v. Denney*, 283 Kan. 781, 794, 156 P.3d 1275 (2007) (acknowledging that this court has not always limited its application of Rule 183(j) to K.S.A. 60-1507 motions). Nevertheless, we have "repeatedly 'recognized that meaningful appellate review is precluded where a trial court's findings of fact and conclusions of law are inadequate to disclose the controlling facts or basis for the court's

8

findings.' *Blair Construction, Inc. v. McBeth*, 273 Kan. 679, 688, 44 P.3d 1244 (2002)." *Hoge*, 283 Kan. at 221-22.

We observe Supreme Court Rule 165 (2014 Kan. Ct. R. Annot. 272) is more generally applicable. It requires that, "[i]n a contested matter submitted to the court without a jury . . . the court must state its findings of fact and conclusions of law in compliance with K.S.A. 60-252." The court's "findings and conclusions may be stated on the record after the close of evidence, or may appear in an opinion or a memorandum of decision filed by the court." K.S.A. 2014 Supp. 60-252.

Regarding Rule 165, we have explained that it

"places on the district court the primary duty to provide adequate findings and conclusions on the record of the court's decision on contested matters. But a party also has the obligation to object to inadequate findings of fact and conclusions of law in order to preserve an issue for appeal because this gives the trial court an opportunity to correct any findings or conclusions that are argued to be inadequate." *Fischer*, 296 Kan. at 825.

Rodriguez particularly contends "[t]he district court made *no* specific findings of fact or conclusions of law." (Emphasis added.) We disagree. At the conclusion of the hearing, the district court stated:

"Well, I do agree with the State's analysis here. You know, looking back if this [new DNA] evidence had been available, it would have been admitted probably in the trial. I guess in retrospect it would have been nice if it had been, but it wasn't and that isn't the test. It seems—there does seem to be a logical explanation why Mr. Vallejos' DNA would be in the bedroom and in the bed. There is no evidence either from all of the evidence at trial or this DNA analysis to suggest that whatever DNA was there was any evidence of this particular sexual assault, that there is any connection between that DNA and the assault because there wasn't any DNA found from the victim.

9

. . . .

> ". . . [T]he jury is the factfinder in this case. I thought there were plenty of facts to support their finding. I guess my decision here today is that this additional fact is unlikely to have yielded or would yield in the event of a new trial a different outcome."

As the State points out, the court found a logical explanation for the presence of Vallejos' DNA at the crime scene, but also found this new evidence failed to link Vallejos to J.S.'s rape. And the court concluded it was therefore unlikely the presence of any of Vallejos' DNA would result in a different verdict at a new trial. While perhaps not nicely enumerated, the court did make findings and conclusions as contemplated by Rule 165.

Contained within Rodriguez' argument about insufficient findings and conclusions is his complaint about the district court's ultimate conclusion that the new DNA evidence was "unlikely" to result in a different verdict. According to Rodriguez, this term does not represent the correct standard for granting a new trial based on favorable postconviction DNA testing results. He points out that, pursuant to K.S.A. 2014 Supp. 21-2512(f)(2), a defendant is entitled to a new trial if there is a "reasonable probability" that the DNA evidence would result in a different outcome at trial. See *Haddock v. State*, 295 Kan. 738, 765, 286 P.3d 837 (2012) (*Haddock III*). The Court of Appeals panel in this case determined that although the district court used the term "unlikely" instead of quoting *Haddock*'s "reasonable probability" requirement, there was no indication it applied the wrong standard or did not understand the law. *Rodriguez IV*, 2012 WL 6734515, at *4. We agree.

The district court was certainly well aware of the "reasonable probability" standard. At the hearing on Rodriguez' motion for new trial based on the new testing, the State identified this standard and relied on it during argument. It informed the court that

10

to grant a new trial, "evidence must be of such materiality that a reasonable probability—not a remote possibility, but a reasonable probability exists that it would result in a different outcome at trial."

After articulating this standard, the State then applied it, arguing there was "no way" the evidence would lead to a different outcome at trial. It particularly emphasized that (1) the jury heard at trial there was no physical evidence linking Rodriguez to the rape; (2) J.S. unequivocally identified Rodriguez as the attacker; (3) Vallejos and Yannes corroborated J.S.'s testimony; and (4) the stain containing Vallejos' DNA was found in the home where he was staying while his sister and brother-in-law were away.

In this specific context of postconviction DNA testing, we have defined "reasonable probability" as "'"a probability sufficient to undermine the confidence of the outcome."'" *Haddock v. State*, 282 Kan. 475, 507, 146 P.3d 187 (2006) (*Haddock II*) (quoting *United States v. Bagley*, 473 U.S. 667, 668, 105 S. Ct. 3375, 87 L. Ed. 2d 481 [1985]). When determining whether such a "reasonable probability" exists,

> "*the court's function is* not to make an independent factual determination about what likely occurred, but rather *to make a probabilistic determination about the likely impact of the new evidence on reasonable, properly instructed jurors*." (Emphasis added.) *Haddock III*, 295 Kan. 738, Syl. ¶ 6.

In its holding that the new DNA evidence was "unlikely" to yield a different result at trial, we conclude the district court made the equivalent of "a probabilistic determination about the likely impact of the new evidence on reasonable, properly instructed jurors." See *Haddock III*, 295 Kan. 738, Syl. ¶ 6; see also American Heritage Dictionary of the English Language 1402 (1971) ("unlikely" means "improbable" or "likely to fail").

11

Because there are no relevant shortcomings in the district court's findings of fact and conclusions of law, we need not remand for their completion or correction. So we proceed to Rodriguez' ultimate issue: whether he is entitled to a new trial as a result of the new DNA evidence.

**Issue 2:** *The district court did not err in denying Rodriguez' motion for new trial because no reasonable probability exists that the new DNA evidence would result in a different outcome at trial.*

Rodriguez' motion for new trial based on DNA testing results is governed by K.S.A. 2014 Supp. 21-2512(f). That subsection sets out "specific and distinct" procedures a trial court must follow depending on whether the results of postconviction DNA testing are unfavorable to the petitioner, favorable to the petitioner, or simply inconclusive. See *Haddock III*, 295 Kan. at 755 (quoting *Goldsmith v. State*, 292 Kan. 398, 402, 255 P.3d 14 [2011]).

Regarding unfavorable DNA testing results, the statute provides the following direction to the court:

"(f)(1) Except as provided in subsection (f)(3), if the results of DNA testing conducted under this section are *unfavorable* to the petitioner, the court:

(A) Shall dismiss the petition; and

(B) in the case of a petitioner who is not indigent, may assess the petitioner for the cost of such testing." (Emphasis added.) K.S.A. 2014 Supp. 21-2512(f)(1).

As for favorable testing results, the statute provides:

12

"(2) If the results of DNA testing conducted under this section are *favorable* to the petitioner and are of such materiality that a reasonable probability exists that the new evidence would result in a different outcome at a trial or sentencing, the court shall:

(A) Order a hearing, notwithstanding any provision of law that would bar such a hearing; and

(B) enter any order that serves the interests of justice, including, but not limited to, an order:

(i) Vacating and setting aside the judgment;

(ii) discharging the petitioner if the petitioner is in custody;

(iii) resentencing the petitioner; or

(iv) granting a new trial." (Emphasis added.) K.S.A. 2014 Supp. 21-2512(f)(2).

Finally, for inconclusive test results the statute provides:

"(3) If the results of DNA testing conducted under this section are *inconclusive*, the court may order a hearing to determine whether there is a substantial question of innocence. If the petitioner proves by a preponderance of the evidence that there is a substantial question of innocence, the court shall proceed as provided in subsection (f)(2)." (Emphasis added.) K.S.A. 2014 Supp. 21-2512(f)(3).

Consequently, a petitioner seeking a new trial under subsection (f) has the burden to establish that "(1) the postconviction DNA test results are favorable and (2) the new DNA '"evidence . . . [is] of such materiality that a reasonable probability exists that it would result in a different outcome at trial."'" *Haddock III*, 295 Kan. at 756-57 (quoting *Haddock II*, 282 Kan. at 502) (ellipses and brackets in original).

13

Rodriguez argues that the new DNA evidence is favorable to him and that the district court abused its discretion in denying his motion for new trial. The State concedes that the new evidence is favorable. But it contends a reasonable person would agree with the district court's refusal to grant a new trial. In particular, it argues the new evidence, when considered in conjunction with the evidence and arguments already heard by the jury at trial, is unlikely to yield a different outcome.

*Standard of review*

The State admits Rodriguez has met the condition required in the first step of our analysis for reviewing a district court's decision denying a motion for new trial under K.S.A. 2014 Supp. 21-2512(f)(2)(B)(iv), *i.e.*, favorable test results. See *Haddock III*, 295 Kan. at 756-57. So we proceed to the second step. Specifically, we determine "if a reasonable person would agree with the district court's decision regarding whether postconviction DNA test results were not of *such* materiality that a reasonable probability exists that it would result in a different outcome at trial." 295 Kan. at 765.

The approach in this step is consistent with our well-established standard of reviewing motions for new trial under an abuse of discretion standard. 295 Kan. at 764 (citing *State v. Warrior*, 294 Kan. 484, 277 P.3d 1111 [2012]) (decision to grant new trial has traditionally been considered under the no-reasonable-person-would-agree prong of the abuse of discretion standard); see also *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014) (citing *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 [2012]) ("Judicial discretion can be abused in three ways:  [1] if no reasonable person would have taken the view adopted by the trial court; [2] if the judicial action is based on an error of law; or [3] if the judicial action is based on an error of fact.").

14

*Discussion*

Throughout these proceedings Rodriguez essentially has argued there was no evidence that during Vallejos' service as a house sitter, Vallejos had done anything in the bedroom where the crimes occurred. So the therefore unexplained presence of his DNA in the bedroom logically raised the suspicion that he was the one who had raped J.S. there.

In arguing that Rodriguez should receive a new trial based on the results of the new DNA testing, his counsel told the district court, "I do not recall the record indicating that he [Vallejos] was staying in that room. . . . If he was not staying in that room and he has potentially a sperm fraction on [the pillowcase], I think that is problematic, Judge. . . . *I don't think the record indicates that he was sleeping or living in that bedroom.*" (Emphasis added.)

And in Rodriguez' brief to this court he repeats this specific theme:

"*No evidence explains why Vallejos' DNA is on the bedding at the scene of the* attack. He stayed at the house for at least a month near the time of the attack, but *we know nothing of his actions in the house beyond that. The evidence does not clearly establish a reason unrelated to the crime why Vallejos' DNA was recovered from the pillowcase.* Perhaps at a new trial the [S]tate can explain why Vallejos' DNA was the only identifiable sample recovered from the crime scene. This is a matter for the new trial, and should not be speculated upon at this point." (Emphasis added.)

But our careful review of the record reveals Rodriguez' jury actually heard evidence that Vallejos had slept, and perhaps had sex, in the bed where J.S. was raped. Specifically, the detective assigned to the case was asked by the State why police

15

obtained DNA samples from Vallejos during the investigation. The detective testified in response:

"A:  Just because he was in the house. *He had said that he was in the bed.*

Q:  Was he a suspect?

A:  No, no.

Q:  Okay. Well, then what was the purpose of retrieving samples when he is not a suspect in any way?

A:  Well, we were going to see if there was anything, as far as his hairs, *but he had already said that he slept in the bed, so it was kind of a moot point.*" (Emphasis added.)

In that same vein, the jury heard the DNA analyst who tested the samples during the initial investigation twice testify on cross-examination that she was told Vallejos may have had sex in the bed. Her second reference was as follows:

"Q:  And you have an unknown DNA male sample from a semen stain that does not match Ramon Rodriguez. We are clear on that, at least?

A:  Yes.

Q:  And you have, now you are telling us, some information that Mr. Vallejos claims to have had sex in the bed. That is what you are telling us?

A:  At the time of the testing I was told that he may have had sex in that room on that bed, yes.

Q:  I see. So you didn't test his [Vallejos'] blood?

A:  No."

The analyst explained that her laboratory's DNA testing was not the type involving numbers such as "1 in a million, 1 in a billion." Rather, the statistics associated with their genetic samples typically involve the "1 in 5,000 to 1 in the 10,000 range." These lower

16

numbers lead to the possibility of purely random DNA matches for the suspect, *e.g.*, Rodriguez. So Vallejos' sample was collected as an "elimination sample."

According to the analyst, if Rodriguez' DNA had matched the semen stains on the bedding, then she would have tested Vallejos' DNA sample to eliminate him as a possible source of the semen. She would do so to ensure the testing had identified the right suspect, *e.g.*, that the matches between Rodriguez' DNA and the bedding samples were not simply random. But because Rodriguez was excluded as a source from any of the bedding stains, the analyst testified there was no reason to test Vallejos' DNA.

The jury had the opportunity to consider this testimony about why Vallejos' DNA could be found in the bedroom, along with the absence of Rodriguez' DNA in all of the semen samples from the bedding and J.S.'s testimony that Rodriguez forced her to swallow his semen. The jury was also able to assess J.S.'s credibility and the evidence corroborating her testimony and to decide whether she was capable of identifying Rodriguez as her attacker.

Rodriguez argues the presence of Vallejos' DNA in the bedroom advances his theory of defense that someone else, *i.e.*, Vallejos, raped J.S. there. But the DNA analyst explained at the evidentiary hearing that even for the one sample where Vallejos was "included as a contributor"—the non-sperm fraction of the pillowcase stain—J.S.'s DNA was not mixed with his. So the analyst concluded it was "very unlikely" this sample containing his DNA was connected with the rape.

The testing results for the remaining samples from the bedding were even less helpful to Rodriguez. The results meant either that (1) Vallejos was eliminated altogether as a DNA contributor or, at best for Rodriguez, (2) no conclusion could be offered on whether he was the source of the DNA profile. So the new DNA evidence does not

17

advance Rodriguez' theory that Vallejos was J.S.'s attacker. If anything, this scientific evidence undercuts his allegation.

We conclude the district court did not err in essentially holding there is no reasonable probability a jury would have reached a different outcome had it considered the testing results. See K.S.A. 2014 Supp. 21-2512(f)(2). So the court did not abuse its discretion in denying Rodriguez' motion for new trial, *i.e.*, it cannot be said no reasonable person would have taken the view adopted by the court. See *Haddock III*, 295 Kan. at 765-66; *Mosher*, 299 Kan. at 3.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.