NOT DESIGNATED FOR PUBLICATION

No. 119,058

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

AKIRA T. BROWN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JAMES R. FLEETWOOD, judge. Opinion filed May 3, 2019. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and MALONE, JJ.

PER CURIAM: Akira T. Brown appeals the district court's decision denying his motion for a new trial following his conviction of first-degree murder for the fatal shooting of James Cooper outside a Wichita nightclub in 2003. Brown's motion was based on the results of his request for forensic DNA testing of two blood samples taken from a parking lot north of the scene of the shooting. Brown claims the district court erred in finding the impact of the DNA evidence, in light of all the other evidence, did not warrant a new trial. We reject Brown's claim and affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

We must review the factual and procedural history of this case in detail to understand fully Brown's current claim. In the early morning hours of January 11, 2003, at the corner of Second Street and Mosley in Wichita, near a nightclub that had recently closed for the night, several fights broke out in "a crowd estimated to number 'a couple hundred' [on] the streets and sidewalks around the club." *State v. Brown*, 285 Kan. 261, 267, 173 P.3d 612 (2007) (*Brown I*), *abrogated in part by State v. Williams*, 306 Kan. 175, 178-79, 392 P.3d 1267 (2017).

James Cooper and his girlfriend, Cecilia Arnold, were in that crowd and, according to Arnold, they saw Terrell Cole chasing two people while holding a gun. Cooper told Cole to stop fighting and put away the gun, which Cole did, although with a "'cocky' and 'bodacious' attitude toward Cooper." 285 Kan. at 268. Cooper and Arnold spoke briefly with Cooper's cousin, Bruce Berry, and they were walking away when "[a] single shot rang out, and the bullet struck Cooper in the back of his head causing a fatal wound." 285 Kan. at 268.

Arnold told police she believed Cole was the shooter but she had not actually seen the shooting. Russell Hunt, who was also in the crowd of people exiting the nightclub, told police that he saw a man wearing a cream-colored shirt draw a handgun, point it toward the middle of Second Street, and fire a single shot. When Hunt finished speaking with police at the scene of the shooting, he noticed a man nearby who looked "'very distraught.'" 285 Kan. at 268. Hunt asked what was wrong and the bystander stated: "'That's my cousin' and 'They said Lovey shot him.'" 285 Kan. at 268. Police knew that Brown was nicknamed "Lovey." 285 Kan. at 269. Hunt later viewed a photographic lineup and identified Brown as the shooter.

2

At least two other people at the shooting scene that night also identified Brown as the shooter. Devon Brown (Devon), who had gone to high school with Brown, told police that she knew Brown as Lovey and that she saw Brown fire the shot. Berry also identified Brown as the shooter, stating that after hearing the gunshot, he saw Brown standing nearby holding a gun. Berry said that he had also seen Brown earlier that night inside the club and that Brown had been wearing a cream-colored shirt.

One of the officers working at the scene of the shooting, Officer Benjamin Jonker, later filed a report stating that a woman—who refused to identify herself—approached him at the scene and said, "'I want to remain anonymous but I want to show you where the man who did the shooting's blood is.'" The woman led Jonker to the "northeast corner of [Second Street] and Mosley," past a "small wooden fence" that separated a parking lot from Second Street, and "to the second row of parking spaces from the south," where she pointed out "several small pools of blood." When Jonker asked how the woman knew the blood "was from the suspect," she stated, "Because I saw him spit it out." Continuing the conversation in Jonker's patrol car, Jonker asked the woman if she had seen the shooting and she said, "No." When asked how she knew who the suspects were, she told Jonker that she "heard them talking in the parking lot on the northeast corner of [Second] and Mosley," and she described two men.

The first person was a dark-skinned black male in his mid-20s, about 6 feet 2 inches tall, weighing 250 pounds, with a 1-inch afro, who was wearing a black, short-sleeved shirt, blue jeans, and a small diamond-studded earring in his right ear. The second person appeared to be in his mid-20s; he was also black, with a medium complexion, about 5 feet 8 inches tall, weighing about 230 pounds. The woman told Jonker that the second man also had a diamond stud in his right ear, and he was wearing a blue-and-white striped sweater and dark pants.

The woman told Jonker that she had been driving to the club when she saw the two men in front of the club, fighting with two bouncers. The taller man walked toward the parking lot, and the shorter man continued to fight with the bouncers. The woman parked in the parking lot and as she walked across the lot, she saw the two men standing next to a parked minivan. The taller man said, "'They jumped me while I was by my damned self in the bathroom.'" The woman saw the shorter man spit blood "several times" on the ground. The taller man said, "'I'm getting my strap and dealing with these fools,'" after which he opened the driver's door to the minivan, leaned inside, and then shut the door. The woman went into the club and, after walking around inside, she left with a friend. She dropped her friend off at a location she would not disclose to police, and then she drove back to the area and "saw the large crowd and all the police."

At around 3:17 a.m., police located Brown, who was wearing a "'tan' shirt." 285 Kan. at 269-70. They took him into custody, and they periodically interrogated him at the police station over the next 12 hours. During the interrogation, Brown gave police several versions of the events: (1) he had not been present at the scene of the shooting; (2) Cole gave a gun to an unknown black male who shot Cooper; (3) Brown was standing near Cole when Cole gave a gun to a man named Adrian Patterson, who shot Cooper; and (4) Cole gave the gun to Patterson and when Patterson raised it, Brown tried to stop the shooting and put his hand on the gun just as it fired. Ultimately, Brown admitted that he was the shooter.

The State charged Brown with first-degree murder, and his first jury trial ended in a mistrial. His second jury trial began on September 22, 2003. The evidence presented at the second trial was quite contentious. Berry identified Brown as the shooter. Berry also testified that he had known Brown for several years and he was "100 percent" sure that Brown was "Lovey." The detective who had presented Berry with a photographic lineup testified that Berry had taken only "[s]econds" to identify Brown in the lineup as Lovey and as "the one who shot James Cooper." Devon also testified that she saw "Lovey" "hold

4

up a gun and fire" and that she identified Brown in a lineup as "Lovey" and as the shooter. Similarly, the detective who presented Devon with a photographic lineup testified that she identified Brown as the shooter with no hesitancy.

Hunt also testified and identified Brown as the shooter. During cross-examination, Hunt testified that on the night in question he had seen an individual named Derrick Hubbard, whom Hunt had known for over 15 years. Hunt said that Hubbard had some blood on his lip and that Hubbard had said that a bouncer punched him. Hunt described Hubbard as 5 feet, 4 or 5 inches tall and 160 to 170 pounds and agreed with the State's assertion that Hubbard's appearance was "[r]emarkably different" than Brown's.

The detective who interrogated Brown testified about the different versions of events Brown had given police and that ultimately Brown had admitted shooting Cooper. The tapes of the interrogations were admitted into evidence.

As part of Brown's defense at the second trial, he wanted to call a police officer who would testify that Hubbard "was named as a suspect." Brown argued that this was admissible evidence because Hubbard was at the nightclub, he had a bloody lip, he had gang affiliations, and he had the "same physical description" as Brown. The district court ruled that Brown could not present the testimony because doing so would violate the district court's pretrial ruling that the evidence was inadmissible under the third-party evidence rule. Later in the trial, Brown sought to call a police sergeant who would testify that he had been told that Hubbard and another man were "involved in the fight"; an officer who would describe "Hubbard as five five, 230 pounds to 240 pounds, has had a left earring"; an officer who would testify that Hubbard was "a suspect along with" Brown; and an officer who would testify "that he was briefed to look for Derrick Hubbard." The district court ruled that the evidence was inadmissible under the third-party evidence rule and because it was irrelevant.

5

Brown next sought to introduce evidence that an anonymous witness reported that Cooper had been involved in an altercation with three other men in the men's restroom and management threw him out of the nightclub. The anonymous witness purportedly also stated that when the three other men came out of the nightclub, one of them shot Cooper and "one of the three went to a parking lot north of Second [Street] and was spitting blood." It is not clear from the record whether this anonymous witness was the woman who spoke with Jonker or another individual.

The district court agreed with the State that there were "serious questions about the relevancy of these blood spots," given the number of fights that apparently occurred that night; "the fact that there was blood found around the scene of [the nightclub] would not be a surprise, and it's very possible that it's totally unrelated to the actual shooting that took place that's the subject matter of this case." The district court also recognized that the evidence might be inadmissible hearsay, so the court excluded the evidence.

Brown did, however, present a witness, Otis Ponds, who testified that Brown had left the nightclub with him at closing time and that they had walked to their cars together. Brown also presented testimony from Eric Goss who said he saw a "[v]ery big guy . . . six five, roughly about 240, 250 pounds" argue loudly with Cooper and then shoot him while the two men stood face to face. When asked whether Brown was the shooter, the witness said he was "positive" that Brown was not the shooter.

Brown testified that on the night in question he saw Cole and Cooper arguing and they each had a gun. Brown testified that he began to walk away from the argument and he saw Cole shoot Cooper. Brown asserted that he confessed to the shooting because he believed that police were telling him if he said it was self-defense, he could go home.

In closing argument, Brown argued that his confession was coerced and that the police focused exclusively on him as a suspect while ignoring evidence pointing to other

6

suspects. Brown also argued that witnesses misidentified him as the shooter. The jury found Brown guilty of first-degree murder. The district court sentenced Brown to life imprisonment with the possibility of parole after 25 years.

Brown filed a direct appeal in which he argued, among other things, that the district court violated his right to present a defense by denying his requests to present evidence of a third-party's guilt. *Brown I*, 285 Kan. at 302. As relevant to the present appeal, Brown specifically challenged the district court's refusal to allow evidence that "Hubbard was also involved in a fight at the scene and had a similar physical description to Brown." 285 Kan. at 302. In rejecting Brown's argument, the Kansas Supreme Court stated: "Some of the evidence proffered by Brown was pure hearsay. And none of the evidence offered by Brown amounted to anything more than baseless innuendo. There is nothing tying these third parties to the shooting." 285 Kan. at 305. Thus, "[u]nder the circumstances, the trial court did not abuse its discretion by excluding evidence of third-party guilt." 285 Kan. at 305. Based on the issues raised, the Kansas Supreme Court affirmed Brown's conviction and sentence. 285 Kan. at 266-67.

In October 2012, Brown filed a petition under K.S.A. 2012 Supp. 21-2512 in which he sought forensic DNA testing of two blood samples taken from the parking lot near the scene of the shooting. *State v. Brown*, No. 110,822, 2015 WL 1636702, at *1 (Kan. App. 2015) (unpublished opinion) (*Brown II*). The district court heard argument at a hearing in March 2013 and ultimately denied the petition, finding that Brown's identity as the shooter was not in dispute at trial because of Brown's confession and witnesses identifying Brown as the shooter. The district court also found that "'[a]fter considering the evidence that was presented at trial . . . there is absolutely no . . . probability of some different outcome at a trial if such DNA evidence were presented assuming it would show exactly what [Brown] is saying it might show.'" *Brown II*, 2015 WL 1636702, at *2.

Brown timely appealed, and this court reversed and remanded to the district court "with directions to grant Brown's petition for forensic DNA testing of the blood samples collected during the investigation that led to his conviction." *Brown II*, 2015 WL 1636702, at *4. Specifically, this court held:

> "In summary, K.S.A. 2014 Supp. 21-2512(c) provides that the court shall order DNA testing 'upon a determination that testing *may* produce noncumulative, exculpatory evidence relevant to the claim . . . that the petitioner was wrongfully convicted or sentenced.' Evidence need not be exonerating to be exculpatory but must only tend to establish a criminal defendant's innocence. Although there is substantial evidence supporting Brown's guilt, our Supreme Court has explicitly rejected the notion of defining exculpatory evidence under K.S.A. 21-2512(c) as being a function of weighing evidence. [Citations omitted.]" 2015 WL 1636702, at *4.

On June 26, 2015, in accordance with this court's decision and mandate, the district court ordered forensic DNA testing of the blood samples. The testing established that the blood was Derek Hubbard's.

On September 19, 2017, Brown filed a memorandum in support of a new trial. He asserted that (1) "[u]pon receipt of full discovery from the criminal case, Mr. Brown discovered that Mr. Hubbard had been actively sought by law enforcement as a suspect in the shooting"; (2) that an eyewitness had identified Hubbard as the shooter; and (3) the blood identified as Hubbard's "was gathered from the spot that the female said Mr. Hubbard shot from."

The State opposed the motion for new trial, arguing that "the DNA evidence is not material because the presentation of such evidence would produce no reasonable probability of a different outcome at a trial." The State contested the factual accuracy of Brown's assertions that an eyewitness identified Hubbard as the shooter and that the

8

blood was gathered from the location of the shooting, and it argued that the DNA evidence "pales in comparison to evidence of [Brown's] guilt."

On October 3, 2017, the district court heard argument on the motion. Brown conceded that his confession played a large part in the State's case against him, but noted that at a new trial, he would be able to present expert testimony attacking the credibility of that confession. He also asserted that one of the State's trial witnesses was a Kansas fugitive at the time of the 2017 hearing. Considering all of these things, along with "the passage of time, the loss of evidence, [and] the loss of witnesses," Brown argued that if he were granted a new trial, "the chance of a different outcome is incredibly high."

The State responded that the correct question was not what a new trial would look like today, but "what would the DNA evidence have done . . . at the time of the [original] trial." Under that standard, the State asserted that the fugitive status of a State's witness was irrelevant. The State again challenged the accuracy of Brown's assertion that an eyewitness identified Hubbard as the shooter. The State also pointed out that the shooting occurred across the street from the parking lot where Hubbard's blood was found.

The district court took the matter under advisement and, on November 14, 2017, it issued its journal entry denying Brown's motion for new trial. The journal entry stated:

> "1. Additional DNA testing was done following a remand of Mr. Brown's case from the Kansas Court of Appeals. Testing revealed that blood spots taken from a parking area north and across a street separating the parking area from the location of the shooting.
> "2. The testing results showed the blood to be that of Derek Hubbard.
> "3. The defendant attempts to bolster the significance of this DNA evidence by suggesting that:
> > a. The defendant was not fully aware that Mr. Hubbard had been considered as a possible suspect in the shooting at the time of trial. The court finds that this

9

is not supported by the record as Mr. Hubbard's presence and suggested link to the shooting had been brought up at the time of trial.

    b.  Mr. Hubbard had been involved in an unrelated and separate altercation at the business location of the shooting. This is supported by the trial record[.]

    c.  Mr. Hubbard had been identified as the shooter by an eye witness. This is not supported by the record of trial but relies on a mistaken summary of Officer Jonker's report by Sgt. Bolen.

    d.  The location of the blood was the same location that a witness identified as the location of the shooting. This is not supported by the record of trial during which it was established that the shooting occurred south and across the street from the location the shooting took place [*sic*].

"4. The defendant also suggests other issues not related to the materiality of the DNA evidence and is [*sic*] not considered by the court at this time.

"5. The court agrees that the results of the DNA testing may provide the first step to tying a third party to the general location and time of the shooting but he [*sic*] has failed to establish sufficient materiality to justify a new trial.

"6. The defendant's motion is denied."

Brown timely appealed the district court's judgment.

## ANALYSIS

On appeal, Brown claims the district court "erred in finding the impact of the DNA evidence as a whole and in light of all the evidence did not warrant a new trial." In response, the State asserts that the district court "did not abuse its discretion in denying [Brown's] motion for a new trial when the evidence was not of such materiality that a reasonable probability existed that it would result in a different outcome at trial."

Brown's motion for new trial was based on the results of his request for forensic DNA testing. See K.S.A. 2018 Supp. 21-2512. This statute provides in part:

10

"[(f)](2) If the results of DNA testing conducted under this section are favorable to the petitioner and are of such materiality that a reasonable probability exists that the new evidence would result in a different outcome at trial or sentencing, the court shall:

(A) Order a hearing, notwithstanding any provision of law that would bar such a hearing; and

(B) enter any order that serves the interests of justice, including but not limited to, and order:

(i) Vacating and setting aside the judgment;

(ii) discharging the petitioner if the petitioner is in custody;

(iii) resentencing the petitioner; or

(iv) granting a new trial."

Under K.S.A. 2018 Supp. 21-2512(f)(2), if the results of postconviction DNA testing are favorable to the petitioner and are so material "that a reasonable probability exists that the new evidence would result in a different outcome at trial," the district court shall hold a hearing and "enter any order that serves the interests of justice," including an order granting the petitioner a new trial. Here, the district court made no explicit finding that the results of the DNA testing were favorable, unfavorable, or inconclusive as to Brown's defense. But the parties seem to agree on appeal that the results of the DNA testing were "favorable" to Brown to the extent that the blood sample matched Hubbard and there was at least some evidence linking Hubbard to the crime.

The standard of appellate review of a district court's order under K.S.A. 2018 Supp. 21-2512 is whether the district court abused its discretion. *State v. LaPointe*, 309 Kan. 299, Syl. ¶ 2, 434 P.3d 850 (2019). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). The party asserting the district court abused its discretion bears the burden of showing such an abuse of discretion. *State v. Stafford*, 296 Kan. 25, 45, 290 P.3d 562 (2012).

11

Brown first argues that the district court erred in finding that the record did not support his assertion that an eyewitness had identified Hubbard as the shooter. In his motion for new trial, Brown asserted: "An *eyewitness* identified Mr. Hubbard as the shooter." (Emphasis added.) At the hearing on the motion, Brown argued: "The reason the police first found this blood that was tested was because of a witness who said, [']If you want to know who the shooter is, this is where he was standing, he spit out blood.[']"

But Brown concedes that the unidentified woman who led Jonker to the blood stains on the parking lot north of where the shooting took place admitted to Jonker that she did not actually see the shooting. Thus, the district court was correct in finding that Brown's assertion that an "eyewitness" had identified Hubbard as the shooter was not supported by the record. Moreover, the only evidence that connected Hubbard to the shooting was hearsay evidence from the unidentified woman who spoke with Jonker. Brown fails to explain how the anonymous witness' statements would be admissible at a new trial, even with the results of the DNA testing matching the blood to Hubbard.

Brown also argues that the district court "failed to consider a holistic approach to how the DNA evidence could be used to support a different outcome in [his] case." Brown points out that at a new trial, he would be able to present expert testimony undermining the credibility of his original confession to the crime. He also asserts that one of the State's trial witnesses would no longer be available to testify at a new trial, increasing the likelihood that the outcome of a new trial would be different.

We reject Brown's argument that the district court erred by failing to consider the effect of the passage of time on the likelihood of Brown's success at a new trial. The test on whether Brown was entitled to a new trial under K.S.A. 2018 Supp. 21-2512 is whether there is a reasonable probability that the newly discovered DNA evidence would have affected the outcome of the original trial—not whether Brown would be successful in a new trial because of missing witnesses. The Kansas Supreme Court recently affirmed

12

a decision denying a motion for new trial based on postconviction DNA testing results, holding that "[t]he district court did not abuse its discretion when it determined there was no reasonable probability these results would have changed *the original trial's* outcome." (Emphasis added.) *LaPointe*, 309 Kan. at 300. See also *State v. Rodriguez*, 302 Kan. 85, 98, 350 P.3d 1083 (2015) ("We conclude the district court did not err in essentially holding there is no reasonable probability a jury would have reached a different outcome had it considered the testing results.").

This court's role on appeal is to determine whether the district court's decision to deny Brown a new trial had "an adequate basis in fact and law" and whether "a reasonable person could agree with that decision." See *LaPointe*, 309 Kan. at 306. As already explained, Brown's contentions that the district court made errors of fact are unpersuasive, as are Brown's contentions that the district court should have considered the effect of time on witnesses' memories and availability. That leaves this court to consider whether "'a reasonable person would agree with the district court's decision [that the] postconviction DNA test results were not of *such* materiality that a reasonable probability exists that [they] would result in a different outcome at trial.'" *Rodriguez*, 302 Kan. at 95. Here, the district court found that Brown "failed to establish sufficient materiality to justify a new trial."

Brown's trial was largely a credibility determination by the jury. Hunt, Devon, and Berry identified Brown as the shooter, and Berry and Devon testified that they had known Brown for several years. Moreover, Brown originally confessed to police that he had shot Cooper. On the other hand, Brown testified that his confession was false, he had not shot Cooper, and he saw Cole shoot Cooper. But unfortunately for Brown, his "new evidence" that Hubbard may have been the shooter based on the forensic DNA testing of the blood samples directly conflicts with his own testimony that Cole was the shooter.

13

Based on the record, the most likely explanation for Hubbard's blood on the parking lot north of the shooting is that Hubbard was at the scene on the night in question and involved in a separate altercation unrelated to the shooting of Cooper. The only evidence that Hubbard was the shooter was hearsay evidence from an unidentified witness and Brown does not explain how this evidence would be admissible even if he were granted a new trial. And we have the fact that three eyewitnesses positively identified Brown as the shooter and he originally confessed to the crime. We agree with the district court that Brown's new evidence could not establish a reasonable probability that it would result in a different outcome at a new trial. Because Brown has failed to show that the district court abused its discretion in evaluating the evidence, we conclude the district court did not err in denying Brown's motion for a new trial.

Affirmed.