NOT DESIGNATED FOR PUBLICATION

No. 125,355

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

NICHOLAS J. KIRMER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Oral argument held January 7, 2025. Opinion filed March 14, 2025. Affirmed.

*Tricia A. Bath* and *Thomas J. Bath Jr.*, of Bath & Edmonds, P.A., of Leawood, for appellant.

*Michael R. Serra*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., HILL and WARNER, JJ.

PER CURIAM: Nicholas Kirmer appeals his conviction for aggravated sexual battery, arguing the district court erred when it denied his motions for a mistrial, and later a new trial, based on the testimony of two witnesses. But after reviewing the trial record and the parties' arguments, we find that the testimony Kirmer challenges did not concern the crime of which he was convicted and thus did not adversely affect the outcome of his trial. We thus affirm his conviction.

FACTUAL AND PROCEDURAL BACKGROUND

In 2017, Kirmer attended a party hosted by one of his close friends (referred to here under the pseudonym John). The guests spent the day shooting clay pigeons and socializing outside. John's girlfriend Jane (also a pseudonym) arrived at the party in the late afternoon. Jane began drinking around 4 or 5 p.m. and had around four to six drinks that night.

People started leaving the party a few hours later. By 11:30 p.m., only Jane, Kirmer, John, and another man remained. The men began taking shots of whisky; Jane, who was tired and "already drunk," lay down on a recliner in the living room. The other man left a little while later, and Jane fell asleep on the recliner shortly after midnight.

Kirmer and John then decided to call it a night. Kirmer lay down on the couch in the living room. Jane was still sleeping in the recliner. John tried to wake her so she could move to the bedroom with him. He testified that he tried poking her, pulling the blanket off her, and sitting on her, but Jane did not wake up. Jane testified that she did not remember any of this—she described herself as a heavy sleeper. Jane "mumbled something and pulled the blanket back up over her head." John left her on the recliner and went to sleep in the bedroom, expecting that she would join him later.

At some point later, John woke to find Jane "hysterical." For several minutes, John could not understand what she was saying, but eventually Jane told him that Kirmer had initiated sexual contact with her and that she had not consented to it. John went to the living room and asked Kirmer to leave.

Jane and John went to the hospital, where Jane underwent a sexual-assault examination by a nurse examiner. The nurse testified that there was bruising on Jane's breasts and "redness to her genital area," which was consistent with sexual intercourse.

The nurse collected oral, vaginal, and anal swabs as well as swabs from Jane's breasts. The nurse also collected the clothes Jane wore to the hospital—a pair of underwear, leggings, a T-shirt, and a bra. And police later collected the blanket that Jane slept with on the recliner.

While at the hospital, Jane and John spoke to a detective with the Shawnee County Sheriff's Office. The detective interviewed Kirmer later that morning, and a recording of this interview was played at trial. In the interview, Kirmer initially denied that anything had happened between him and Jane. But he later admitted that sometime during the night, he had approached Jane's recliner and began rubbing the outside of her leg. He stated that Jane responded to this touching and initiated further sexual contact. Kirmer kissed Jane's breasts, and Jane slid underneath him, undid his belt buckle, and inserted his penis into her vagina. Kirmer stated that at some point Jane grabbed his face—which he interpreted as her looking for John's beard—and realized that Kirmer was not John. Kirmer then curled up on the ground, and Jane left the room.

The State charged Kirmer with rape and aggravated sexual battery. Both crimes were charged under two alternative theories: that Jane was unable to consent due to the effect of alcohol and that the interactions occurred when she was unconscious.

The case against Kirmer proceeded to trial. The jury ultimately found Kirmer not guilty of both rape charges, as well as the aggravated sexual battery based on the theory that Jane had been too intoxicated to consent. But it found Kirmer guilty of the remaining alternative charge of aggravated sexual battery—finding he had touched Jane with the intent to arouse his (or her) sexual desires when Jane was asleep.

Kirmer's challenges on appeal center on statements by two witnesses who testified at his trial: John and a forensic scientist who worked for the Kansas Bureau of Investigation (KBI). To provide context, we discuss both sets of testimony in some detail.

3

*John's trial testimony*

John testified at length about the events leading up to and after he learned of the encounter between Kirmer and Jane. He also discussed his comments to the detective at the hospital, where he stated he had a hard time believing that Kirmer could have done the things Jane said, as Kirmer and John had been close friends for so long. During John's trial testimony, the State asked him whether he had reviewed his statement to the detective. John answered that he had. The following exchange then took place:

"Q. And having had a chance to review it, was there anything that you said during that interview that you now think you shouldn't have said?

"A. I do. I was in a lot of shock at the time, and I was very—I was just confused and didn't quite understand the severity and the realness of everything that had gone on. I thought of [Kirmer] as like my blood brother. To be real honest, I trusted [Kirmer] more than my brothers at some points in time. And I had said that it was hard to believe that this had happened, and with that being said, I was in a little bit of disbelief that this could have gone on with someone that I trusted and was so close with.

"Q. And what are your thoughts on that today after having reflected on that?

"A. I never doubted [Jane]. Nobody could act the way that she was talking to me—"

Kirmer objected, arguing John's last comment provided a credibility opinion and thus invaded the province of the jury. The district court asked the jury to leave the courtroom, and Kirmer moved for a mistrial. He argued that the State was intentionally eliciting testimony from John that would improperly bolster Jane's credibility. The court agreed that John's statement was improper, but it found that the State had not intentionally sought this testimony and found that the testimony did not require the trial to be adjourned.

The court then invited the jury back into the courtroom, where it struck John's response to the State's most recent question and instructed the jury not to consider that response in its analysis of the evidence:

> "It is up to [you] to determine the weight and credit of the testimony of any witness. A witness cannot testify to the veracity or the lack of veracity of another witness. That is your job as the members of the jury. So any remark that [John] made as to his lack of doubt as to what [Jane] said is to be disregarded by you, because it is for you, the jury, to decide as to whether a witness is being truthful or not."

*The KBI expert's trial testimony*

Later in the trial, two forensic scientists from the KBI testified to the results of two rounds of biological testing they performed on items collected during the investigation. During the first round of testing, they found seminal fluid and Kirmer's DNA on a cutting of Jane's underwear. Although they found seminal fluid on part of the blanket that Jane had been sleeping with, they did not find Kirmer's DNA on it.

The State shared the results of the first round of testing with the defense. In response, Kirmer retained an expert who also filed a report. This expert criticized the KBI's decision not to perform a different type of DNA testing—the Phadebas test, which looks for an enzyme found in high concentration in saliva. She explained that this test could have provided insight regarding whether Kirmer's saliva was present.

During the second round of testing, the KBI scientists found an amount of Kirmer's DNA on Jane's breast swabs that was "consistent with direct contact." The State also shared these results with the defense. The defense expert filed a second report, again noting that they had not performed the Phadebas test.

5

These tests, and the absence of the Phadebas test, were a focus of the various experts' testimony at trial. The State asked one of its KBI experts, Samantha Buck, whether she conducted "any sort of test for saliva" during either round of testing. Buck responded that she had not because the Phadebas test

> "is not a super reliable test. It is one of the better tests that are out there, which is why we use it. But because it's not very reliable, it is typically practice in the laboratory that we will just take a sample on for DNA instead of wasting or consuming a sample on a test that may or may not give a result."

Both the State and the defense pressed Buck on why she believed the Phadebas test was "unreliable" and why she was purportedly concerned about consuming the available samples. Buck clarified that the Phadebas test is "scientifically admissible," and "many laboratories across the country" use it. She also acknowledged that there were still samples available by the end of the DNA testing and that it was possible that saliva could be present on any of the items she tested. But she maintained that she believed the Phadebas test was "unreliable" and only provided limited information that could be more easily determined through other means.

Following this testimony, Kirmer moved for a mistrial. He noted that although Buck's pretrial reports indicated that she had not run the Phadebas test, those reports did not explain her reasoning. Thus, Kirmer argued, the State had violated its duty under K.S.A. 22-3212(b)(2) by having its expert witness give "testimony that [was] not disclosed in any expert summary or report." The State countered that Kirmer was not entitled to a mistrial because this testimony was irrelevant to the central issue—whether the sexual contact between Kirmer and Jane was consensual. And even if Buck had conducted the Phadebas test, the State contended, the results would have added "nothing new," given the DNA evidence and Kirmer's own admissions. The district court agreed; it

found the testimony "would have little likelihood of influencing the jury's ultimate decision" and denied Kirmer's motion.

After the jury returned its verdict—finding Kirmer not guilty of rape and one alternative charge of aggravated sexual battery, but guilty of the remaining charge—Kirmer moved for a new trial. He claimed that Buck's testimony was "scientifically and factually false" and had undermined the fairness of the trial proceedings. In response, the State argued that Buck's testimony could not have affected the jury's verdict because it related only to the rape charges—of which Kirmer was ultimately acquitted. The State noted that it was undisputed that Kirmer had rubbed the outside of Jane's leg while she was asleep on the recliner, and this evidence was sufficient to support his conviction of aggravated sexual battery.

The district court held a hearing and heard testimony from various witnesses regarding Buck's trial testimony, including the director of the KBI's laboratory. The court later denied Kirmer's motion, concluding that Buck's testimony was not false and had not affected the outcome of Kirmer's trial.

The court imposed a 32-month prison sentence but suspended that sentence and ordered Kirmer to serve 36 months of probation. Kirmer appeals.

DISCUSSION

On appeal, Kirmer challenges the district court's ruling on both of his motions for a mistrial—concerning John's testimony that he "never doubted" Jane and Buck's testimony that the Phadebas test was "not super reliable"—as well as his request for a new trial. According to Kirmer, both witnesses' testimony violated his right to a fair trial, and the court abused its discretion in finding otherwise. As the appellant, Kirmer must

persuade us that the district court erred in its handling of each of these claims. See *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021).

K.S.A. 22-3423(1)(c) states that a district court may grant a mistrial in a criminal case if "prejudicial conduct . . . makes it impossible to proceed with the trial without injustice" to the parties. Similarly, K.S.A. 22-3501(1) recognizes that a district court may grant a new trial if such a remedy is "required in the interest of justice." While the statutory language giving rise to these remedies differs, both motions seek to answer the same fundamental question—"whether the challenged event deprived [the defendant] of a fair trial." *State v. Harris*, 313 Kan. 579, 585, 486 P.3d 576 (2021).

In both instances, appellate courts review the district court's finding that a defendant has received a fair trial for an abuse of discretion. See 313 Kan. at 585. A court abuses its discretion when it renders a decision based on a legal or factual error or if that decision is one with which no reasonable judicial officer would agree. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). This deferential standard reflects the district court's position in observing witness testimony, evaluating the parties' arguments in real time, and managing the proceedings—tasks an appellate court can only review from a cold record. See *State v. Schaefer*, 305 Kan. 581, 595, 385 P.3d 918 (2016).

Our analysis as to whether the district court's rulings deprived Kirmer of a fair trial involves two steps. *State v. Carr*, 314 Kan. 744, 772-73, 502 P.3d 511 (2022), *cert. denied* 143 S. Ct. 584 (2023). We first determine whether the district court erred—that is, whether there was some "fundamental failure" in the proceedings at trial. 314 Kan. at 773. If an error occurred, we assess whether there is a reasonable probability it affected the outcome of the trial in light of the entire record. 314 Kan. at 773. A reasonable probability is one that is sufficient to undermine our confidence in the jury's verdict. *State v. Rodriguez*, 302 Kan. 85, 93, 350 P.3d 1083 (2015).

1. *The district court did not abuse its discretion in denying Kirmer's mistrial motion based on John's testimony.*

Kirmer first argues that John's statement that he "never doubted [Jane]" was an improper comment on Jane's credibility. Kirmer argues that comment invaded the province of the jury and should have triggered a mistrial because one cannot "unring the bell." We disagree and find no fault with the district court's handling of that comment at trial.

When John started to testify as to Jane's credibility, the defense objected. Then, outside the presence of the jury, Kirmer immediately moved for a mistrial, asserting that the manner the prosecutor had questioned John during his testimony (asking him about his "thoughts on that [his previous feelings that Kirmer could not have engaged in this behavior] today after having reflected on that") showed that the State was intentionally seeking to bolster Jane's credibility.

After reviewing the transcript to determine exactly what was said, the district court concluded that John's statement was improper, as it attempted to comment on Jane's credibility. But the court found that the statement—that John had always believed Jane—was not solicited by the State, as the prosecutor's line of questioning concerned John's previous statements to the detective, not whether he believed his girlfriend. The court found that this comment did not require a mistrial. But when the jury was back in the courtroom, the court struck the statement from the record and admonished the jurors against considering anyone's assessment of credibility other than their own.

The State concedes that John's testimony was an improper comment on another witness' credibility, and we agree. See *State v. Elnicki*, 279 Kan. 47, 53, 105 P.3d 1222 (2005). But our analysis does not end there. Instead, Kirmer must demonstrate that there was a reasonable likelihood that John's statement—and the manner the district court

9

responded to that statement—adversely affected the outcome of Kirmer's trial. See K.S.A. 2024 Supp. 60-261; see also *Elnicki*, 279 Kan. at 68 (noting that the admission of a witness' improper credibility assessments is reviewed for harmless error). In other words, Kirmer must show that the prejudice arising from John's statement so infected the trial as to erode our faith in the fairness of the proceedings. He has not made this showing.

Our Supreme Court has explained that appellate courts' prejudice analysis of a district court's handling of a mistrial request must include an assessment of "whether the prejudicial conduct's damaging effect can be removed or mitigated through jury admonition or instruction." *Harris*, 313 Kan. at 585. We engage in this analysis with both the facts apparent to the district court at the time it rendered its decision and the "broader view" of "the entire record"—including the trial's outcome. *State v. McCullough*, 293 Kan. 970, 981, 270 P.3d 1142 (2012).

John's comment about Jane's credibility was interrupted by defense attorney's objection and the court's recess. The comment was brief and limited, and the district court immediately addressed it when the jury returned—striking the comment from the record and providing a limiting instruction. This course of action was reasonable and appropriately tailored based on what had occurred. The court did not abuse its discretion.

On appeal, Kirmer asserts that the district court erred when it found that the State had not intentionally elicited John's statements, and the willful nature of the State's actions rendered these remedial actions insufficient. While we can appreciate Kirmer's frustration with the State's line of questioning, the district court—after thoroughly discussing the issues with both parties and reviewing the transcript—found that the State had not intentionally elicited improper testimony. Given the district court's superior position to make these findings, we are loath to second-guess its conclusion. This is

10

particularly the case where, as here, the witness' answer does not respond directly to the prosecutor's question.

Yet even if Kirmer were correct, a mistrial would only be appropriate if Kirmer demonstrated that John's improper testimony, viewed through the lens of the court's remedial action, was so prejudicial that we could no longer trust the trial's outcome. The jury found Kirmer not guilty of rape or aggravated sexual battery resulting from Jane's intoxication. This outcome is consistent with Kirmer's theory of defense—that Jane was asleep when Kirmer went over to the recliner and rubbed her leg but that she later awoke and consented to the other sexual contact. So even though Kirmer argues the jury *could have* afforded more credibility to Jane's story because of John's improper testimony, the record shows the jury did not do so.

Kirmer has not shown that John's improper testimony affected the trial's outcome. Thus, the district court did not abuse its discretion in denying Kirmer's mistrial motion.

2. *The district court did not abuse its discretion when denying Kirmer's motions for a mistrial and a new trial based on Buck's testimony.*

Kirmer next offers two interrelated arguments as to why he is entitled to either a mistrial or new trial based on Buck's testimony relating to the Phadebas test. First, he contends that the State violated its duty under K.S.A. 22-3212(b)(2)—a rule that prohibits an expert's testimony from being "materially" different from what was disclosed in their pretrial report—because Buck's pretrial report did not disclose her reasons for foregoing the Phadebas test. See *State v. Genzel*, No. 120,602, 2020 WL 3481499, at *3 (Kan. App.) (unpublished opinion), *rev. denied* 312 Kan. 896 (2020). Second, he asserts that the testimony was scientifically false and a new trial is needed to remedy this inaccuracy.

11

We need not discuss these allegations in detail because, even if we were to agree with Kirmer's characterization of Buck's testimony, Kirmer has not shown that this testimony affected the outcome of his trial. Buck's challenged testimony related primarily to the rape charges, of which Kirmer was ultimately acquitted. Though that testimony potentially could have related to the aggravated sexual battery charges (the action of kissing Jane's breasts), Kirmer did not deny that this action had occurred; he only maintained that it was consensual—a matter the Phadebas test could not shed any light on. Again, Kirmer has not shown that the challenged testimony affected the outcome of the trial. The district court did not err when it denied his request for a mistrial and a new trial based on that testimony.

Throughout the trial, Kirmer centered his theory of defense on the contention that, after he woke Jane by rubbing her leg, the remaining sexual contact between the two was consensual. He repeatedly emphasized that this theory was entirely consistent with the State's evidence. After hearing all the evidence, the jury returned a verdict that was consistent with this theory.

"No trial is perfect. But a defendant is entitled to a fair trial, not a perfect one." *State v. Arreola*, 64 Kan. App. 2d 562, 576, 554 P.3d 684, *rev. denied* 319 Kan. 834 (2024); see *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013). Because Kirmer received a fair trial under the law, we affirm his conviction.

Affirmed.